

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00058-CV

_____

IN THE INTEREST OF O.R.F., A CHILD

On Appeal from the 307th District Court
Gregg County, Texas
Trial Court No. 2012-1038-DR

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Carter

O P I N I O N

Wendy Reese-Manns was addicted to methamphetamine. The consequences of her drug use materialized in the termination of her maternal relationship with six-year-old O.R.F. following a suit brought by the Department of Family and Protective Services (the Department). After considering and addressing all issues Manns raises on appeal, we affirm the trial court's judgment.

I.    Factual Background

The Department initially became involved after it "received a report advising that Ms. Manns and [her newborn baby, G.B.,] both tested positive for methamphetamines at the time of delivery" on February 26, 2012. Manns admitted to Leesa Davis, an investigator with the Department, that she had recently used methamphetamine[1] and that the newborn was "up for adoption." When Davis asked Manns where her then five-year-old daughter, O.R.F., and her four-year-old son, D.J.,[2] were living, Manns replied that they were left with her sister, Maria Lawson, and "had been there off and on for several months."

When asked about her past relationships, Manns reported a disturbing pattern. In 2004, Manns said she was "in a relationship with a guy [named Mario] that did turn a little bit violent at the end." She then "admitted that she had been in a domestic violence relationship with a Quincy Jacobs,[3] that at one time he had pinned her up against the wall with the children

---

[1]Manns stated, "I would get a bunch of people together that wanted to . . . go get [methamphetamine], and I would get something off of that."

[2]D.J. was "placed with . . . his father."

[3]Jacobs was the father of newborn G.B.

2

watching, and had tried to have . . . sex with her with the children watching." During the pendency of the Department's investigation, Manns' family reported that she was "living in a RV" with Clint Humphrey, "who has used drugs." In an effort to assist Manns, Davis referred her to family-based safety services and permitted the children to remain with Lawson.

Karen Roberson, a conservatorship worker with the Department, explained to Manns the gravity of the Department's concern, the consequences of non-compliance with the Department's directives, and the importance of staying in contact with the Department. After various intakes, evaluations, and meetings, a family service plan, which provided for reunification on May 20, 2013, was signed on March 30, 2012. The plan required drug treatment, random drug testing, participation in a drug assessment, completion of a psychological evaluation, participation in domestic violence training, regular weekly communication with caseworkers, completion of a parenting class, and payment of any court-ordered child support. In addition, Manns was to obtain treatment for her mental health needs, demonstrate an ability to keep appointments, and notify the Department of any difficulties with transportation to various appointments. After successful completion of the above, Manns was required to demonstrate her financial ability to care for the child by providing an appropriate home and "maintain[ing] appropriate housing for at least 4 months" in order to secure the return of O.R.F.

The Department's first goal was to assist in treating Manns' drug addiction. Davis determined that Manns should first "seek out . . . an appointment for the Beginnings," an out-patient drug treatment program. Davis gave Manns "all the information in order for her to set up an appointment," but no appointment was scheduled until Davis did so one month later. Manns

3

missed both this appointment and a second appointment that Davis had subsequently arranged. Davis told the court that it "was very hard" to keep in contact with Manns during the months of April and May 2012. Davis testified, "I left her messages, I called her mother to try to get her to call me. I went out to her residence several times; I left notes on the doors. I even put -- I sent her a certified letter out to her residence to try to get her to call me." When Davis was finally able to contact Manns, she agreed to take a drug test but "never showed up." Despite Davis' reminders and warnings, Manns' excuse for missing the Beginnings appointments and the drug test was simply that she had forgotten. Davis testified, "[S]he was not very cooperative at all."

Manns took a drug test on May 4, 2012, and Davis testified that the levels of amphetamines and methamphetamines were very high. Manns was still living with Humphrey, a man who Roberson testified "has another CPS case where [there] was concern[] about that child and the welfare of his child." Roberson said, "[W]e talked over and over again about her leaving Mr. Humphrey's home and going to a shelter and trying to get away from that. She wasn't interested." It became clear that Manns was making no effort to change, and on May 18, the Department filed its "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." On May 29, the trial court adopted the service plan and entered temporary orders requiring Manns to "submit to and cooperate fully in the preparation of the court-ordered drug and alcohol dependency assessment," "attend the drug treatment recommended," "submit to random drug testing within 24 hours of the request from the caseworker," "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit," and "complete parenting

4

classes." The order allowed Manns to have one hour of supervised visitation per week and required her to pay child support to the Department in the amount of $227.83 per month.

The Department continued its efforts to assist Manns, but Roberson testified she missed mental health appointments and two additional appointments at Beginnings. Roberson testified, "There was one time she had a bruise on her arm," indicating that Manns was still being subjected to domestic violence. Community Healthcore licensed chemical dependency counselor, Debbie Barnes, testified that Manns was referred on July 12 "to the dual diagnosis program through the intensive outpatient program," which would also treat Manns' mental health. In total, Manns attended only two individual sessions, which "were basically . . . getting her admitted." Manns was not working at the time and did not have the transportation to attend the "four days a week" program.[4]

Barnes testified, "The psychiatrist said he was not going to give her any medication while she was still using because she was testing positive." During one meeting with the psychiatrist, "there was an indication that she had used that day," and Manns admitted to the use. Manns reported that Humphrey, whom "she was living with[,] was also a substance abuser and alcohol and drugs, and that when he would get high he would abuse her."[5] They discussed in-patient care and the possibility of Manns "being admitted to Oak Haven Recovery Center, which is also with[in] Community Healthcore." However, when seeking to follow up on this possibility,

---

[4]Because Roberson testified Manns was unable to stay in weekly contact with the caseworker, it is unclear whether she notified the Department about her transportation issues during this time as required by the service plan.

[5]Roberson knew Humphreys "was the one supplying the drugs for [Manns]."

Barnes was unable to get in contact with Manns. After trying many times to contact her, Barnes discharged Manns from the program on September 13.

Manns did not appear for all of her supervised visits and would miss "on average one to two a month." Roberson testified, "When I was the caseworker, she avoided drug tests. I would call her and ask her to go, and she would say she would and then wouldn't show." Manns "missed some [drug] tests in September, October, and [November]."

Around the October–November timeframe, Manns discovered that she could not be admitted into an in-patient drug treatment program "because her blood pressure was elevated and not treated with medication" and because she did not "have a birth certificate and a valid Texas driver's license or I.D. to seek medical treatment." When Manns claimed she would only be successful if she went to in-patient treatment, Roberson said, "[I]f the in-patient isn't available, you need to go to out-patient." When asked why she did not seek drug treatment prior to October, Manns replied that "at that time, I thought I had it under control, which was absolutely out of control. I was not willing to admit I had a drug addiction, was not willing to do it for my children."

At a November 14, 2012, review hearing, the trial judge warned Manns, after hearing from all parties, that she had "a lot of work to, do." Again, the Department's service plan was adopted as an order of the court. A drug test administered before the November 14 hearing "came back . . . extremely positive."

Roberson ended a supervised visit on December 28, 2012, so that Mann could take a drug test. The test was positive, and Roberson testified she "did not hear from [Manns] at all the month of January" 2013.

While Manns was doing drugs, O.R.F. was receiving treatment. Roberson testified O.R.F. had "seen her mother in domestic violent situations." Roberson stated that O.R.F. "sat through at least a couple situations that I'm aware of." Stenet Palmer Frost, a licensed professional counselor, treated O.R.F. while she was living with Lawson and described her behavior during their first meeting in August 2012 as "aggressive." During one occasion, O.R.F. had a "meltdown [that] included crying, kicking, screaming, and she had to be removed from the setting and to time out, and it required additional attention from the caregiver." Frost testified that O.R.F. "hardly ever mentioned her" mother. She reported that "on the weeks where there was no contact with her mother, [O.R.F.'s] behavior was far more appropriate." After some time, O.R.F. stopped "[g]etting on the coffee table, running around, yelling" and "displayed a good understanding of the house rules . . . and asking permissions for things she desired." Her behavior was also "improving in school."

In January 2013, Lawson decided she could no longer care for O.R.F. Frost testified, "[M]y understanding is it was just . . . becoming overwhelming for not only the caretaker, but the family as a whole." Although O.R.F. still needed therapeutic care, sessions with Frost ended after removal from Lawson's home. O.R.F. was placed with Manns' mother, Sandra Nobles. When Nobles believed she could no longer take care of O.R.F., the child was placed into foster care on January 11. On February 20, O.R.F. arrived at the home of her current foster family.

Roberson believed that "it was only until January when [Manns'] sister gave up and felt like she couldn't take care of her child anymore, that she'd actually get serious about taking initiative in this case." However, Manns had admitted to using drugs on February 18, 2013. That day, she "was admitted into detox." Manns "was discharged from the detox program" on February 23. She had no job and, despite the trial courts orders, had failed to pay child support.

Tina Brown, house manager at the Hope Haven Rescue Mission, a Christian homeless shelter, testified that Manns came to the shelter on February 26, 2013, one year after the Department had become involved. Manns received a pass from the house to stay away overnight on March 2 "for work" but did not return "by curfew." As a consequence, shelter rules specified that Manns "was out for two weeks." It was later discovered that Humphrey had retrieved Manns from the shelter on March 2. Manns testified that her purpose in leaving with Humphrey was "[t]o make money . . . [t]o have with me at Oak Haven." She did not testify how much money she made or what kind of work she did.

The trial court set the trial date for April 24, 2013. On March 7, Manns was "admitted for in-patient residential care" after passing a drug test. She testified that she "worked three days shoveling concrete for $85" to get her blood pressure treated to gain admission into residential care. Manns completed the treatment and was discharged on April 6, 2013. She was eligible for a psychological evaluation on April 5, but had not completed it.[6] Roberson testified that Manns did not have any contact with O.R.F. from December 28, 2012, until April 8, 2013, when she

---

[6]Roberson testified that a psychological evaluation for the purposes of treatment at Community Healthcore had been completed, but that Manns never completed an evaluation "for CPS."

8

attended a therapy session. The session was conducted by licensed professional counselor, Camella Jones, who had been treating O.R.F. since March 1, 2013.

Jones testified that O.R.F. "had been diagnosed with child anti-social disorder [and] adjustment disorder with mixed disturbances of conduct and emotion, and [that she] was having great difficulty" in her foster home.[7] She was also diagnosed with "abuse and neglect unspecified." Jones opined that "the exposure to drug use, the instability in her home environment, the inconsistent parenting, the shuffling around, so to speak, or different family members" had affected O.R.F.'s life. Jones added that "[s]he has also witnessed some domestic violence, just a maltreatment of her mother, that has caused her great worry and anxiety."

During the April 8 visit,[8] Jones witnessed O.R.F. scold her mother for having cigarettes and described the interaction between O.R.F. and Manns as a "role reversal." Roberson testified that O.R.F. was "very concerned about her mother" and described her (O.R.F.) as "the parent in this relationship," adding that "Ms. Manns tends to seek validation from her daughter." According to Jones, Manns began sharing "Our Daily Bread" with O.R.F., which Jones described as "a mature devotional" that "was not appropriate" for O.R.F. Manns then showed O.R.F. a Bible and told O.R.F. that she was reading it. Roberson believed this behavior was inappropriate because Manns was looking for validation from O.R.F. Roberson testified that

---

[7]In detailing these difficulties, Jones testified that O.R.F.

> has totally destroyed her room when she's angry. She has hit her foster parent. She has thrown toys and hit her younger foster siblings. She has ran over them deliberately with her tricycle after being asked not to. She has spit, she has kicked. She has thrown -- tried to break her window, throwing things at her window in her room. That's what comes to mind just right off the bat some of the things we have dealt with.

[8]Jones felt that Manns' interaction was appropriate with O.R.F. "because it was supervised and there wasn't any way for her to really do anything that would have been, you know, really devastating to the child."

Manns went into great detail with O.R.F. about her drug treatment and "was showing her manuals to her six-year-old, seeking approval from her daughter that she was doing the right things."

Around April 10, 2013, after the supervised visits, Manns returned to the Hope Haven Rescue Mission. Brown testified that she was doing well. On April 12, Manns moved the court for a continuance of the trial, which was denied on the ground that it was not "in the best interest of this child to prolong the case." The case was tried on April 24, less than six weeks after Manns admitted to methamphetamine use.

At trial, Manns emphasized her progress. She had "signed up with . . . project success," and they would "work with [her] to . . . re-establish independence, as well as housing." She was currently in drug treatment with Community Healthcore and said the class would last "between 60 and 90 days." Mann testified, "I go to classes from 6:00 to 9:00, Monday through Thursday, and on Tuesdays and Thursdays I go from 4:30 to 9:00 because the parenting class is from 4:30 to 6:00." Manns testified she "attend[ed] [Narcotics Anonymous] meetings at Living Recovery, New Attitudes," and Celebration Recovery. She said that if O.R.F. were returned to her custody, she could continue attending the meetings at Celebration Recovery because there is a program at that facility for children.

At trial, Brown testified that Manns had moved back into the shelter two weeks before trial and was "doing extremely well" there. When asked about how she would provide for O.R.F., Manns testified that she had gotten a job at Hope's Closet, that her first day of

employment would be the day after trial, and that she would be making $7.25 per hour.[9] She testified that if the court did not want O.R.F. to live in the shelter, they could live with Manns' grandmother. The grandmother did not testify at trial, and Manns said she had distanced herself from her mother and sister. As an explanation for distancing herself from her family, Manns offered, "I do not believe at this point in my recovery that it is helping." Although she had used methamphetamine six weeks prior to trial, Manns testified she had plans to return to school to become a licensed chemical dependency counselor.

Jones testified at trial that O.R.F. was still in weekly counseling with her and that she would need continued counseling given her diagnoses. She told the court that O.R.F. could "recover" if her mother's rights were terminated. Roberson's notes showed no contact between Manns and O.R.F. from December 28, 2012, to April 8, 2013. Both Roberson and Cheryl Hunt, a Court-Appointed Special Advocate guardian ad litem, testified that termination of Mann's parental rights would be in the best interests of the child. Hunt was concerned that Manns had expressed no plan to provide stability for O.R.F. Hunt testified that O.R.F. is fond of her foster parents, "calls them mom and dad, and there's times that she tells them, you know, I love you." According to Hunt, O.R.F. seemed "pretty adjusted" and "fairly secure there."

After hearing the evidence and "with a very heavy heart," the court terminated Manns' parental rights with respect to O.R.F.[10]

---

[9]Manns also described her efforts to obtain employment prior to her offer at Hope's Closet.

[10]The trial judge commented, "This case presents a shining example of the tragedy of methamphetamines in our society."

## II.     Sufficient Evidence Supports a Statutory Ground for Termination

A parent's rights to "'the companionship, care, custody, and management'" of his children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981)); *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003).  Decisions from Texas courts show great respect for the biological bond between parent and child, recognizing that the "'natural right which exists between parents and their children is one of constitutional dimensions.'" *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.—Texarkana 1995, writ denied).  However, the Texas Supreme Court has also recognized that "'the rights of natural parents are not absolute; protection of the child is paramount. . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities.'" *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)). The child's emotional and physical interests must not be sacrificed merely to preserve parental rights.  *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

In a termination case, the Department seeks not just to limit parental rights, but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit.  TEX. FAM. CODE ANN. § 161.206(b) (West 2008); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings in favor of the parent.  *In re S.K.A.*, 236 S.W.3d 875, 900 (Tex. App.—Texarkana 2007, pet. denied) (citing *Holick*, 685 S.W.2d at 20).

12

To terminate an individual's parental rights to his child, the Department must prove, and the trial court must find, by clear and convincing evidence, both of the following statutory requirements: (1) that the parent has engaged in one of the statutory grounds for termination and (2) that termination is in the child's best interest. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012); *C.H.*, 89 S.W.3d at 23. The clear and convincing burden of proof has been defined as "'that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *C.H.*, 89 S.W.3d at 23 (quoting *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979)); TEX. FAM. CODE ANN. § 101.007 (West 2008). Due process demands this heightened standard. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). Thus, in reviewing termination findings, we determine whether the evidence is such that a fact-finder could reasonably form a firm belief or conviction about the truth of the State's allegations. *C.H.*, 89 S.W.3d at 25.

In a legal sufficiency review, termination findings are given appropriate deference. *See J.F.C.*, 96 S.W.3d at 266; *Smith v. Tex. Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 673, 679 (Tex. App.—Austin 2005, no pet.). In such cases, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder could reasonably have formed a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *J.F.C.*, 96 S.W.3d at 266. We assume that the fact-finder resolved disputed facts in favor of the finding if a reasonable fact-finder could do so, disregard evidence that the fact-finder may have reasonably disbelieved, and disregard the testimony of witnesses whose credibility may reasonably be doubted. *J.P.B.*, 180 S.W.3d at 573.

In short, we disregard all evidence that a reasonable fact-finder could have disbelieved. *Id.* We consider, however, undisputed evidence even if it is contrary to the finding. *Id.*

The inquiry in a factual sufficiency review is "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *C.H.*, 89 S.W.3d at 25. We consider whether disputed evidence is such that a reasonable fact-finder could not have resolved that disputed evidence in favor of its finding. *Id.* at 26–27. If, in weighing the disputed evidence, the fact-finder could have reasonably resolved the conflicts to form a firm conviction that the State's allegations concerning the grounds for termination were true, then the evidence is factually sufficient and the termination findings must be upheld. *Id.* at 18–19; *see also J.F.C.*, 96 S.W.3d at 266.

The trial court's order of termination in this case found that Manns:

6.2.1. knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

6.2.2. engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child;

6.2.3. used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance;

6.2.4. failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

14

Manns argues that the findings supporting termination on the statutory grounds of Section 161.001(1)(D), (E), (O), and (P) are not supported by sufficient evidence. TEX. FAM. CODE ANN. § 161.001(1). Only one predicate finding under Section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *A.V.*, 113 S.W.3d at 362; *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.); *In re N.R.*, 101 S.W.3d 771, 775 (Tex. App.—Texarkana 2003, no pet.).

A trial court "may order termination of the parent-child relationship if the court finds by clear and convincing evidence: (1) that the parent has . . . (E) engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E). Endanger "'means to expose to loss or injury.'" *In re N.S.G.*, 235 S.W.3d 358, 367 (Tex. App.—Texarkana 2007, no pet.) (quoting *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). This statutory ground for termination "'refers only to the parent's conduct, as evidenced not only by the parent's acts, but also by the parent's omissions or failures to act.'" *Id.* at 366–67 (quoting *In re S.K.*, 198 S.W.3d 899, 902 (Tex. App.—Dallas 2006, pet. denied)). "To be relevant, the conduct does not have to have been directed at the child, nor must actual harm result to the child from the conduct." *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ)); *N.S.G.*, 235 S.W.3d at 367.

However, termination on this ground "must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required."

*Perez*, 148 S.W.3d at 436 (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.)); *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *N.S.G.*, 235 S.W.3d at 367. "The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct." *Perez*, 148 S.W.3d at 436 (citing *In re N.K.*, 99 S.W.3d 295, 300 (Tex. App.—Texarkana 2003, no pet.)).

Complaining that "the relevant time frame for when . . . culpability attaches is the environment before the child was removed," Manns argues that there is no evidence that she endangered the child because O.R.F. was living with Lawson during the intake and did not live with Manns during the pendency of the case. The relevant time frame for establishing that the parent "knowingly . . . allowed the child to remain in conditions or surroundings which endanger[ed] the physical or emotional well-being of the child" under Section 161.001(1)(D) is prior to the child's removal[11] since conditions or surroundings cannot endanger a child unless that child is exposed to them. TEX. FAM. CODE ANN. § 161.001(1)(D). However, the conduct to be examined under Section 161.001(1)(E) includes what the parents did both before and after the child was born because a course of conduct must be established. *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509, 522 (Tex. App.—El Paso 2004, pet. denied); *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 83–84 (Tex. App.—Dallas 1995, no writ).

---

[11]*Compare In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.) (addressing Section 161.001(1)(D)), *with In re H.L.F.*, No. 12-11-00243-CV, 2012 WL 5993726, at **4, 7 (Tex. App.—Tyler Nov. 30, 2012, pet. denied) (mem. op.) (looking only to conduct prior to removal when considering Section 161.001(1)(D), but going beyond that time frame when addressing Section 161.001(1)(E)).

"Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct" by a parent sufficient to support a petition to terminate parental rights. *Perez*, 148 S.W.3d at 436; *N.S.G.*, 235 S.W.3d at 367–68. "A parent's failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under subsection (E) even if there is no direct evidence that the parent's drug use actually injured the child" "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *In re J.A.W.*, No. 02-08-215-CV, 2009 WL 579287 at *4 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (mem. op.) (citing *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)).

In this case, Manns had abandoned two of her children for several months, leaving them with Lawson, and had voluntarily relinquished parental rights to their sibling prior to the Department's involvement. It is uncontested that Manns used methamphetamine in February, May, July, November, and December 2012 and on February 18, 2013. Manns had a history of abusive relationships, resulting in the children witnessing her abuse, and returned to an abusive partner, Humphrey, on March 2, 2013, even though he used and provided her with drugs. She failed to take advantage of opportunities for drug treatment and counseling until a few weeks before trial, demonstrating an unwillingness to ensure the emotional well-being of O.R.F. She did not visit the child for an extended period. As of the date of trial, she was homeless and had

not yet started a job. The evidence showed that her drug use and inability to provide for O.R.F. would subject the child to a life of uncertainty.[12]

Manns' drug use also led to her failure to comply with the trial court's orders adopting the Department's service plan, as required under Section 161.001(1)(O). It is undisputed that (1) Manns failed to maintain regular contact with the caseworkers, (2) did not "submit to random drug testing within 24 hours of the request from the caseworker," (3) had not completed the required psychological evaluation, (4) had not paid court-ordered child support, and (5) had not "maintain[ed] appropriate housing for at least 4 months," a condition precedent to the return of O.R.F. to her custody, care, and control.

As a result of her mother's conduct and witnessing her mother's abuse, O.R.F. developed emotional issues requiring therapy. Jones testified that the effect on O.R.F. was "devastating actually. It causes her to have great difficulty focusing. It causes her to have great difficulty trusting and bonding, and just developing healthy social relationships, because the mind is constantly preoccupied with thoughts and worries of her past, and sometimes even her present."

We find the evidence both legally and factually sufficient to support termination of Manns' parental rights under Section 161.001(1)(E) and (O).

## III. Termination Was In O.R.F.'s Best Interests

Next, we must decide how to reconcile "a parent's desire to raise [the] child with the State's responsibility to promote the child's best interest." *In re E.R.*, 385 S.W.3d 552, 555 (Tex.

---

[12]*See In re M.N.G.*, 147 S.W.3d 521, 538–39 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g) (noting that parent's prolonged history of unemployment and financial instability, among other things, indicates inability to provide for child, which is relevant consideration in trial court's finding of endangerment).

18

2012). There is a strong presumption that a child's interest is best served by preserving the conservatorship of the parents; however, clear and convincing evidence to the contrary may overcome that presumption. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). In deciding whether termination is in the best interest of the child, the trial court may consider this nonexclusive list of factors: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *K.W.*, 335 S.W.3d at 770.

Also, evidence offered to prove grounds for termination, the amount of contact between the natural parent and child, the natural parent's ability to provide financial support, and the quality of care rendered by a child's caregiver are all relevant to determining if termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 28. It is unnecessary to prove all of these factors as a condition precedent to parental termination. *Id.* at 27.

O.R.F. was only six years old at the time of trial. As a result, there is no evidence in the record with respect to her desires. Manns argues that "the child missed and loved her mother." "Evidence that a child loves a parent, enjoys visits, and shows affection is marginally relevant." *In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied). Frost testified that O.R.F.

19

"hardly ever mentioned her" mother. Aside from two supervised visits in April 2013, Manns had not seen her daughter since the previous year. O.R.F. called her foster parents "mom and dad" and expressed affection towards them. The evidence showed that when O.R.F. was with Manns, she was anxious and worried about whether Manns was "making good choices." We consider this factor neutral.

With respect to O.R.F.'s physical and emotional needs and the prospets of physical and emotional danger in the future, Manns argument is basically that "she ha[s] changed." Yet, "[e]vidence of past misconduct or neglect can be used to measure a parent's future conduct." *Id.* (citing *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.")). Both Frost and Jones testified about the emotional ramifications to O.R.F. of Manns' drug use, poor decisions, and need for validation from her daughter and told the court that O.R.F. would need continuous counseling. The evidence demonstrated that it would be difficult for Manns to meet O.R.F.'s emotional needs given that Manns missed appointments for counseling, had experienced issues with transportation, and had a long history of drug abuse, with the last instance of use only six weeks prior to trial. Manns had previously abandoned O.R.F. and her brother for several months, leaving them at Lawson's home, and she voluntarily relinquished her parental rights to her third child because she could not provide for his physical needs. Because she no longer maintained a relationship with Lawson, was homeless, was unemployed for the duration of the case, and had demonstrated no ability to remain employed, the risk of Manns being unable to provide for O.R.F.'s physical needs was high. The possibility of Manns relapse

20

into the world of drug use and her re-entry into an abusive relationship with Humphrey posed a very real danger to O.R.F. We find that these factors weigh heavily in favor of termination. Further, Manns' acts or omissions indicate that the existing parent-child relationship is not a proper one.

Manns' parenting abilities had yet to be demonstrated at the time of trial. During the pendency of the case, Manns had failed to take any steps in the right direction until February 18, 2013, when she admitted to having a drug problem and entered a rehabilitation program. However, only twelve days later, on March 2, she took a significant step backwards when she was ejected from Hope Haven Rescue Mission for violating curfew due to an excursion with Humphrey. The evidence showed that her interactions with O.R.F.—in seeking approval from her, showing her drug treatment manuals, and reading her adult devotionals—were not age appropriate. O.R.F. often questioned if Manns was making good choices. Manns failed to take advantage of supervised visitation and counseling programs to treat her mental health issues, continued living and/or associating with a man who abused her and provided her with drugs, missed many opportunities for drug treatment, and had only recently begun drug treatment. Although Manns was on the right track at the time of trial, "evidence of a recent improvement does not absolve a parent of a history of irresponsible choices." *In re F.F.*, No. 10-12-00462-CV, 2013 WL 2639217, at *5 (Tex. App.—Waco Jun. 6, 2013, no pet.) (mem. op.) (citing *A.M.*, 385 S.W.3d at 83). We find these factors weigh heavily in favor of termination.

Manns believes that her plans for the child demonstrate stability for O.R.F. because the Department had not yet secured a permanent placement for O.R.F. However, "there is no

requirement that the Department's plans for a child be defined prior to termination." *Spencer v. Tex. Dep't of Family & Protective Servs.*, No. 03-10-00498-CV, 2010 WL 5464110, at *3 (Tex. App.—Austin Dec. 31, 2010, no pet.) (mem. op.). "[T]he lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *C.H.*, 89 S.W.3d at 28. "Instead, the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *Id.*

Manns did not maintain stable housing for a period of four months, a condition precedent to O.R.F.'s return. The plan Manns submitted to the trial court was to return with O.R.F. to the shelter even though Manns had already violated the shelter's rules once resulting in her expulsion for fourteen days. Because she would hopefully be working during the day, she planned to attend treatment classes at night and told the court she would take O.R.F. with her to these meetings. In comparison, the Department's plan was to keep O.R.F. with her stable foster family who provided for her needs and had already received counseling for adults seeking to aid children who had experienced trauma in their lives. The evidence showed that O.R.F. was "pretty adjusted," felt "fairly secure" with her foster family, and expressed her affection toward them. Hunt testified that the family was committed to O.R.F.'s long-term care. We find that the parties' plans for the child and the stability of the home or proposed placement weigh in favor of termination.

22

Finally, although Manns was not able to seek in-patient drug use rehabilitation treatment for a period of time due to her high blood pressure, which could not be treated without a valid birth certificate or photo identification, there is no excuse for Manns' failure to timely seek outpatient drug treatment or mental health treatment. There was also no excuse for Manns' repeated use of methamphetamine throughout the duration of the case, her return to Humphrey on March 2, 2013, or her failures to maintain employment, obtain housing, or attend scheduled supervised visits when she was not in in-patient treatment. We find this evidence weighs in favor of termination.

We conclude that the evidence was legally and factually sufficient to support the trial court's best-interest finding.

## IV. The Motion for New Trial Was Properly Denied

We review a trial court's ruling on a motion for new trial based on newly discovered evidence for an abuse of discretion. *Hooper v. Smallwood*, 270 S.W.3d 234, 245 n.6 (Tex. App.—Texarkana 2008, pet. denied) (citing *Mitchell v. Bank of Am.*, *N.A.*, 156 S.W.3d 622, 629 (Tex. App.—Dallas 2004, pet. denied)). A party seeking a new trial on the ground of newly discovered evidence must show the trial court that (1) the evidence has come to his knowledge since the trial, (2) it was not owing to the want of due diligence that it did not come sooner, (3) it is not cumulative, and (4) it is so material that it would likely produce a different result if a new trial were granted. *Id.* (citing *Wheeler v. Greene*, 194 S.W.3d 1, 6 (Tex. App.—Tyler 2006, no pet.)).

Manns took a drug test on the day before trial. The result was not available before trial. When it yielded a negative result, she filed a motion for new trial based on newly discovered evidence. On appeal, she complains that the trial court erred in overruling the motion for new trial because the drug test provided independent evidence that she was drug free, which she believes would have likely caused a different result.

It is uncontested that the negative result came to counsel's knowledge after trial. However, at the hearing on the motion for new trial, the court heard that Manns' counsel waited until the day before trial to execute the drug test, and the court found this to be a lack of diligence. The Department also argued, and the trial court found, that because it was uncontested that Manns was drug free at trial, the results were cumulative. Indeed, the record demonstrates the trial court's belief at trial that Manns had "in recent months . . . made extreme steps in the right direction," had "come to recognize the enormity of the problem[,] . . . [and had] turned the light switch on." In light of the trial court's belief that Manns was drug free and the evidence that was sufficient to terminate Manns' parental rights despite her recent turnaround, the trial court was free to determine that the negative drug test was not so material that it would likely produce a different result if a new trial were granted.

Further, the Department introduced evidence from Mitchell Grayson, a chemical dependency counselor for Community Healthcore, who testified that Manns was to follow up her in-patient treatment at Oak Haven with aftercare. Grayson concluded that Manns was eligible and would "follow up what we call relapse prevention." He was "to see her at least once a week for individual sessions . . . four times a week," but Manns did not complete the program.

24

Although she had testified at trial about the class that demanded attendance "between 60 and 90 days," Grayson testified she only attended three classes. Grayson confirmed that Manns was discharged from the Community Healthcore program for noncompliance.

We find no abuse of discretion in the trial court's decision to deny a new trial. This point of error is overruled.

## V. Denial of Extension Was Proper

Manns argues that the newly discovered evidence "conclusively show[ed] that [she] had gotten sober and was sober and drug free on the day of trial." She argues that "[b]ased upon the newly discovered evidence, the Trial Court abused its discretion in not granting a new trial[13] and an extension of the case based on newly discovered evidence on the issue of completion of the family service plan."

Manns cites to no authority supporting her position. When a brief contains no authority to support its argument, the point is inadequately briefed and, thus, will be overruled. *Baker v. Gregg Cnty.*, 33 S.W.3d 72, 79 (Tex. App.—Texarkana 2000, no pet.) (citing TEX. R. APP. P. 38.1(h); *Bowles v. Reed*, 913 S.W.2d 652, 661 (Tex. App.—Waco 1995, writ denied)).

We may, however, address Manns point nonetheless in the interest of justice. We review a trial court's decision on a motion for continuance for an abuse of discretion. *In re T.T.*, 39 S.W.3d 355, 361 (Tex. App.—Houston [1st Dist.] 2001, no pet.). The trial court may retain the suit on the court's docket for a period not to exceed 180 days if it finds that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the

---

[13]To the extent the point of error complains of a failure to grant a new trial, it is overruled.

25

department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." TEX. FAM. CODE ANN. § 263.401(b) (West 2008).

Failure to begin complying with a family service plan until several weeks before trial does not constitute an extraordinary circumstance when the requirements necessary to obtain the return of the child were known well in advance of that time. *Shaw v. Tex. Dep't of Family & Protective Servs.*, No. 03-05-00682-CV, 2006 WL 2504460, at *8 (Tex. App.—Austin Aug. 31, 2006, pet. denied) (mem. op.). Further, "'[t]he focus is on the needs of the child.'" *In re G.P.*, No. 10-13-00062-CV, 2013 WL 2639243, at *1 (Tex. App.—Waco Jun. 6, 2013, no pet.) (mem. op.) (quoting *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied)). Actions that are "considered to be the parent's fault" will generally not constitute an extraordinary circumstance. *Id.* We overrule this point of error.

## VI.     The Family Service Plan and Order of Termination Were Not Void

Manns argues that the family service plan was void because it failed to set time limits for dates of completion of certain acts. The plan required random drug testing, meaning that there was to be no date certain. The trial court ordered Manns to "submit to random drug testing within 24 hours of the request from the caseworker." She was to demonstrate an ability to keep appointments, and this obligation arose each time an appointment was set. Manns was supposed to maintain regular weekly communication with caseworkers, another weekly obligation. She was required to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." Thus, the deadline for compliance for

26

each requirement would have been prior to termination. As of that date, Manns had yet to complete a qualifying psychological evaluation. The plan required her to pay court-ordered child support, and the trial court set an obligation that was due at a certain time each month. No payment was ever made as Manns had no income. Manns was also required to demonstrate her financial ability to care for O.R.F. by providing an appropriate home and "maintain[ing] appropriate housing for at least 4 months" in order to obtain the return of O.R.F. The family service plan and the court's order contained many deadlines that Manns failed to meet. We find this point of error and Manns' related arguments concerning a lack of deadlines in the family service plan to be wholly without merit.

Manns also challenges the court's order because it does not contain the mandatory language of Section 263.405(b)[14] advising parties of the right to appeal and of the accelerated nature of the appeal. A judgment or order is void when it is apparent that the court rendering it had no jurisdiction over the parties, no jurisdiction over the subject matter, no jurisdiction to enter the judgment or order, or no capacity to act as a court. *Mapco, Inc. v. Forrest*, 795 S.W.2d 700, 703 (Tex. 1990) (orig. proceeding) (per curiam). This is not such an order. Because the complaint is that the order of termination did not inform Manns of her rights on appeal, and because she has timely appealed, we find the issue moot. It is overruled.[15]

---

[14]"A final order rendered under this subchapter must contain the following prominently displayed statement in boldfaced type, in capital letters, or underlined: 'A PARTY AFFECTED BY THIS ORDER HAS THE RIGHT TO APPEAL. AN APPEAL IN A SUIT IN WHICH TERMINATION OF THE PARENT-CHILD RELATIONSHIP IS SOUGHT IS GOVERNED BY THE PROCEDURES FOR ACCELERATED APPEALS IN CIVIL CASES UNDER THE TEXAS RULES OF APPELLATE PROCEDURE. FAILURE TO FOLLOW THE TEXAS RULES OF APPELLATE PROCEDURE FOR ACCELERATED APPEALS MAY RESULT IN THE DISMISSAL OF THE APPEAL.'" TEX. FAM. CODE ANN. § 263.405(b) (West Supp. 2012).

27

**VII. Manns Failed to Preserve Her "As Applied" Constitutional Challenges to the Texas Family Code**

Manns argues that Sections 161.206 and 263.102 of the Texas Family Code are unconstitutional as applied to her. Specifically, she claims that the sections are unconstitutional because they permit termination of parental rights "without there being established a date or dates certain in the" family service plan, thus, "depriving her of notice."

"As a prerequisite to presenting a complaint for appellate review, the record must show that: (1) the complaint was made to the trial court by a timely request, objection, or motion" and that the trial court either ruled or refused to rule on the subject. TEX. R. APP. P. 33.1(a). This preservation requirement applies to assertions that the Texas Family Code is unconstitutional as applied. *In re C.R.P.*, 192 S.W.3d 823, 826–27 (Tex. App.—Fort Worth 2006, no pet.); *see In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003); *Rittenhouse v. Sabine Valley Ctr. Found., Inc.*, 161 S.W.3d 157, 166 (Tex. App.—Texarkana 2005, no pet.).

We find nothing in the record demonstrating that Manns' constitutional challenge was raised in the trial court. Accordingly, we overrule her points of error raising as applied constitutional challenges.

---

[15]Typically, absent one of those rare circumstances that makes the judgment void, the mere fact that an action by a court is contrary to a statute or rule makes it voidable or erroneous. *Mapco*, 795 S.W.2d at 703. However, the issue in this case is moot. Assuming error, if any, Manns would be unable to demonstrate any harm arising from the omission.

## VIII.  Conclusion

We affirm the trial court's judgment.

Jack Carter
Justice

Date Submitted:    September 19, 2013
Date Decided:      October 17, 2013