

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-20-00084-CV
_____


IN THE INTEREST OF J.S., A CHILD


On Appeal from the County Court at Law
Panola County, Texas
Trial Court No. 2019-196


Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

The Department of Family and Protective Services (Department) brought a petition for protection of a child, for conservatorship, and for termination of Mother's parental rights to one-month-old J.S.[1]  Following a bench trial, the trial court found that termination of the parent-child relationship was in the child's best interest and terminated Mother's parental rights pursuant to Section 161.001(b)(1), grounds (D), (E), and (O), and Section 161.001(b)(2) of the Texas Family Code.  *See* TEX. FAM. CODE ANN. §§ 161.001(b)(1)D), (E), (O), (b)(2).  Mother's appeal challenges the legal and factual sufficiency of the evidence as to the best-interest finding and to the grounds of termination.  Because we conclude that the grounds of termination and the best-interest finding are supported by clear and convincing evidence, we affirm the trial court's judgment.[2]

"The natural right existing between parents and their children is of constitutional dimensions."  *In re E.J.Z.*, 547 S.W.3d 339, 343 (Tex. App.—Texarkana 2018, no pet.) (quoting *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985)).  "Indeed, parents have a fundamental right to make decisions concerning 'the care, custody, and control of their children.'"  *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)).  "Because the termination of parental rights implicates fundamental interests, a higher standard of proof—clear and convincing evidence—is required at trial."  *Id.* (quoting *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014)).  "'Clear and convincing

---

[1]To protect the child's privacy, we refer to appellant as Mother and to the child by initials.  *See* TEX. R. APP. P. 9.8(b)(2).

[2]Father's parental rights were terminated in accordance with his voluntary affidavit of relinquishment.  Father did not appeal the order of termination.

evidence' is that 'degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *Id.* (quoting TEX. FAM. CODE ANN. § 101.007 (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)). Based on this standard, we are required to "engage in an exacting review of the entire record to determine if the evidence is . . . sufficient to support the termination of parental rights." *Id.* (quoting *A.B.*, 437 S.W.3d at 500).

Yet, "[d]espite the profound constitutional interests at stake in a proceeding to terminate parental rights, 'the rights of natural parents are not absolute; protection of the child is paramount.'" *Id.* at 344 (quoting *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (quoting *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994)) (citing *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003)). "A child's emotional and physical interests must not be sacrificed merely to preserve parental rights." *Id.* (quoting *In re C.A.J.*, 459 S.W.3d 175, 179 (Tex. App.—Texarkana 2015, no pet.)).

"In our legal sufficiency review, we consider all the evidence in the light most favorable to the findings to determine whether the fact-finder reasonably could have formed a firm belief or conviction that the grounds for termination were proven." *In re L.E.S.*, 471 S.W.3d 915, 920 (Tex. App.—Texarkana 2015, no pet.) (citing *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.L.B.*, 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.)). "We assume the trial court, acting as fact-finder, resolved disputed facts in favor of the finding, if a reasonable fact-finder could do so, and disregarded evidence that the fact-finder could have reasonably disbelieved or the credibility of which reasonably could be doubted." *Id.* (citing *J.P.B.*, 180 S.W.3d at 573).

3

"In our review of factual sufficiency, we give due consideration to evidence the trial court could have reasonably found to be clear and convincing." *Id.* (citing *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006) (per curiam)). "We consider only that evidence the fact-finder reasonably could have found to be clear and convincing and determine 'whether the evidence is such that a fact[-]finder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id.* (quoting *H.R.M.*, 209 S.W.3d at 109 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)) (citing *In re J.F.C.*, 96 S.W.3d 256, 264, 266 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

"Only one predicate finding under Section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied) (quoting *A.V.*, 113 S.W.3d at 362) (citing *In re K.W.*, 335 S.W.3d 767, 769 (Tex. App.—Texarkana 2011, no pet.)). Because the trial court's findings under grounds D and E "may have implications for . . . parental rights to other children," due process demands that we review the trial court's findings under each of those grounds. *In re N.G.*, 577 S.W.3d 230, 234 (Tex. 2019).

*(1)    Sufficient Evidence Supports Termination Under Grounds D and E*

When the record demonstrates clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child," termination is proper on

4

ground D. TEX. FAM. CODE ANN. § 161.001(b)(1)(D). "A child is endangered when the environment creates a potential for danger that the parent is aware of, but disregards." *In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.). "'Environment' refers to the acceptability of the child's living conditions and a parent's conduct in the home." *In re D.A.B.*, No. 04-19-00629-CV, 2020 WL 1036433, at *3 (Tex. App.—San Antonio Mar. 4, 2020, no pet.). "[S]ubsection (D) permits termination [of parental rights] based on a single act or omission [by the parent]." *In re L.C.*, 145 S.W.3d 790, 797 (Tex. App.—Texarkana 2004, no pet.); *see In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied). "Inappropriate, abusive, or unlawful conduct by a parent . . . can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D)." *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *6 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.). "Endanger" means, for purposes of grounds D and E, "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *see L.E.S.*, 471 S.W.3d at 923.

Termination is permitted on ground E when there is clear and convincing evidence that the parent "engaged in conduct . . . which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(E). "It is not necessary that the conduct be directed at the child or that the child actually suffer injury." *L.E.S.*, 471 S.W.3d at 923. "Under subsection (E), it is sufficient that the child's well-being is jeopardized or exposed to loss or injury." *Id.* (citing *Boyd*, 727 S.W.2d at 533; *N.S.G.*, 235 S.W.3d at 367). "Further, termination under subsection (E) must be based on more than a single act or omission. Instead, a 'voluntary,

5

deliberate, and conscious course of conduct by the parent is required.'" *Id.* (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.) (citing *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.))). "Courts may further consider parental conduct that did not occur in the child's presence, including conduct before the child's birth or after the child was removed from a parent's care." *Id.* Because they are interrelated, we consolidate our examination of grounds D and E.

Department investigator Cordia Page received a report in May 2019, when J.S. was one month old, that Mother and her mother (Grandmother) were both using methamphetamine and were living with J.S. in a home that lacked electricity. When Page visited Mother at her home, she confirmed that J.S. was living there with Mother and Grandmother and that, although the home was clean, it lacked electricity. Both Mother and Grandmother denied using methamphetamine. A few days later, Page took Mother for a drug test. Mother refused a hair-follicle test but did submit to a urinalysis.[3] The results showed that Mother was positive for methamphetamine.[4] Despite these test results, Mother claimed that she did not use methamphetamine, but only tested positive because her ex-boyfriend used methamphetamine.[5] As a result of the positive drug test, Page determined that it was unsafe to leave J.S. in the home and placed him in the care of the Department.

---

[3]According to Page, Mother claimed that a hair-follicle test was against her religion.

[4]Page also testified that Grandmother tested positive for methamphetamine but did not indicate whether Grandmother was tested at the same time as Mother was tested.

[5]J.S. was not tested.

Following her positive drug test in May 2019, on both January 28, 2020, and September 16, 2020, Mother again tested positive for methamphetamine. Mother did not show up for the majority of the twenty-four drug tests the Department requested because, as Mother explained at trial, she "knew [she] was going to fail, and . . . didn't want to [give] them ammo to use against [her]." Mother's methamphetamine use began well before 2019. She originally started using methamphetamine when she was married to the father of her third child sometime in 2017 or 2018. Although Mother did not use methamphetamine during her pregnancy with J.S., she admitted to using methamphetamine with Grandmother before she became pregnant with J.S. and continued to do so after J.S. was born. Her then husband also used methamphetamine. Mother testified that, after she had J.S., she did not often use methamphetamine, but began using the drug more frequently after the Department removed J.S. According to Mother, she last used methamphetamine one month before trial, in September 2020. Mother did not attend any type of drug counseling within the three-month period before trial.

Mother also experienced problems with domestic violence and admitted that that had been "a really big issue" for her. She explained that she was living on her own when she gave birth to J.S. and that Grandmother was staying with her, off and on. At that time, Mother still had contact with an abusive boyfriend and eventually moved in with him after the Department removed J.S. While the case involving J.S. was ongoing, Mother and her boyfriend smoked methamphetamine together. Mother testified that she called the police more than five times before pressing charges against her boyfriend for assaulting her. Mother made a final break from

7

her boyfriend approximately two months before trial, after he burned her in the face with a cigarette.

Mother's history of drug use and her struggle with domestic violence is reflected in previous Department interventions on behalf of Mother's other three children. Mother's oldest child is eleven years' old, and her other children are ages nine and seven. The oldest two children were removed by the Department and were placed with Mother's paternal grandmother due to violence in the home wrought by Mother's boyfriend, who was also using drugs. Mother's parental rights to her middle child were terminated in 2012 after she tested positive for drugs during pregnancy.[6] That child lives with his paternal grandmother.

From May 2019 until the time of trial in October 2020, Mother has lived in different situations—with friends, a boyfriend, Grandmother, and her grandmother—with lengths of stays varying from a few days to a few weeks at a time. Mother was employed at a restaurant before the COVID-19 pandemic. Since that time, she has worked at Sam's and Gen-Pack. At the time of trial, Mother was unemployed.

Tommie Rivers, a Department conservatorship worker, testified that Mother's family service plan required her to undergo a substance abuse assessment and a mental health assessment, submit to random drug tests, and attend parenting, counseling, budgeting, and intimate partner violence classes.[7] She was also required to provide a stable home for J.S. and

---

[6]Although the Department pled for termination on ground M, that ground was not included in the order of termination. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(M) (parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E)").

[7]When the case began, Mother was involved in an abusive relationship.

maintain employment. Mother did not fulfill these requirements. Although Mother completed a substance abuse assessment and three in-person substance abuse counseling sessions, she began missing her virtual sessions after the pandemic began, and she was discharged. Mother did not participate in psychological counseling or intimate partner violence counseling.

It is apparent that Mother struggled with drug addiction before this case began and continued in that struggle throughout the case. Mother freely spoke of her methamphetamine use at trial and at the time the Department removed J.S. from her care. Mother tested positive for methamphetamine in December 2019 and in September 2020, only one month before trial. Beyond that, she did not show up for her drug tests because she knew that she would test positive. After Mother brought J.S. home from the hospital, both she and Grandmother continued to use methamphetamine. Mother did not complete substance abuse counseling and showed little to no interest in working services to be reunited with J.S. Mother's drug use and involvement with an abusive boyfriend, who also used drugs, resulted in the previous removal of Mother's two oldest children. Mother's drug use during pregnancy with her third child in 2012 resulted in the termination of Mother's parental rights to that child.

"'Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct' by a parent sufficient to support a petition to terminate parental rights." *O.R.F.*, 417 S.W.3d at 38. Mother's failure to "remain drug-free while under the Department's supervision will support a finding of endangering conduct under subsection (E) even if there is no direct evidence that the parent's drug use actually injured the child" "[b]ecause it exposes the child to the possibility that the parent may be impaired or imprisoned."

9

*Id.* (quoting *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). "Moreover, illegal drug use by a parent likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *L.E.S.*, 471 S.W.3d at 925 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)); *see In re N.B.*, No. 06-12-00007-CV, 2012 WL 1605457, at *9 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.). "Indeed, the effect of drug use on a parent's life and 'ability to parent may establish an endangering course of conduct.'" *In re K.D.*, No. 06-17-00068-CV, 2017 WL 5504407, at *5 (Tex. App.—Texarkana Nov. 17, 2017, no pet.) (quoting *In re J.L.B.*, 349 S.W.3d 836, 848 (Tex. App.—Texarkana 2011, no pet.)).

Mother was also involved in an abusive relationship at the time of J.S.'s removal and remained in that relationship until shortly before trial. Domestic violence—like drug addiction—had been an ongoing problem in Mother's life over several years. Mother's entanglement with an abusive boyfriend resulted, at least in part, in the removal of two of her children. "A fact-finder 'can consider the history of abuse between the mother and the father for purposes of subsection[] . . . (E), even if the children are not always present.'" *In re Z.M.*, 456 S.W.3d 677, 686 (Tex. App.—Texarkana 2015, no pet.) (quoting *In re A.V.M.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi May 9, 2013, pet. denied) (mem. op.)). Here, it was undisputed that Mother and her boyfriend had a history of domestic violence. That said, Mother continued to expose herself to that violence even after J.S. was born. It is also apparent that Mother had unstable housing during the pendency of the case and was unable to

remain employed.  Mother stayed with her abusive boyfriend as well as Grandmother, both of whom used methamphetamine.

Considering the entire record, we conclude that the evidence is both legally and factually sufficient to support termination under grounds D and E.  As a result, we overrule these points of error.[8]

*(2)*		*Sufficient Evidence Supports the Finding that Termination Was in J.S.'s Best Interest*

"There is a strong presumption that keeping a child with a parent is in the child's best interest."  *In re J.A.S., Jr.*, No. 13-12-00612-CV, 2013 WL 782692, at \*7 (Tex. App.—Corpus Christi Feb. 28, 2013, pet. denied) (mem. op.) (citing *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)).  "Termination 'can never be justified without the most solid and substantial reasons.'"  *In re N.L.D.*, 412 S.W.3d 810, 822 (Tex. App.—Texarkana 2013, no pet.) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)).

In determining the best interests of the child, courts consider the following *Holley* factors:

(1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals, (6) the plans for the child by these individuals, (7) the stability of the home, (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent.

*Id.* at 818–19 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *see also* TEX. FAM. CODE ANN. § 263.307(b).  "There is no requirement that the party seeking termination prove all nine factors."  *N.L.D.*, 412 S.W.3d at

---

[8]Because we have concluded that termination is supported by grounds D and E, we need to determine whether termination was proper on ground O.  *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(O).

819 (citing *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)). Further, we may consider evidence used to support the grounds for termination of parental rights in the best-interest analysis. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). "A parent's inability to provide adequate care for her child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interests." *N.L.D.*, 412 S.W.3d at 819 (citing *In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.)). "Parental drug abuse is also a factor to be considered in determining a child's best interests." *Id.* (citing *In re M.R.*, 243 S.W.3d 807, 820 (Tex. App.—Fort Worth 2007, no pet.)).

At the time of trial, J.S. was seventeen months old. He had been in the same placement since May 2019, when he was one month old and was doing quite well. Mother regularly exercised her visitation rights with J.S. Due to the pandemic, though, much of Mother's visitation was virtual. Although J.S. was too young to tell anyone whether he wished to live with Mother, Mother testified that J.S. cried when he was separated from his foster parents and experienced separation anxiety at visitation. This *Holley* factor weighs somewhat in favor of termination.

We address the second, third, seventh, and eighth *Holley* factors together. Given his young age, J.S.'s emotional and physical needs now and in the future are great. Although Mother was provided parenting classes to help her understand how to meet the child's needs, Mother testified that she did not complete those classes because she thought the person in charge was "kind of a quack." Throughout the case, Mother showed little interest in completing

12

services to be reunited with J.S., instead choosing to remain with her abusive boyfriend and engage in illicit drug use.

At the time of trial, Mother had been living in an apartment on her own for about a month and a half. She had separated from her abusive boyfriend and claimed to have last used methamphetamine the previous month. She was seeking employment at the time of trial through the Workforce Innovation and Opportunity program, but her sole source of income was unemployment benefits. She testified that, if J.S. were returned to her, she would have family support. She admitted, however, that, although she participated in counseling, she probably needed additional counseling.

Yet, Rivers testified that she did not believe that Mother was able to provide a safe and stable home environment for J.S. And, although Mother had made progress and had "wonderful intentions," Rivers believed that, due to Mother's methamphetamine use over a period of years, she would need an intense in-patient program and then be sober for "quite some time" before she would be in a position to provide a stable home for J.S. Mother also admitted that, before she could bring J.S. home, she would need to attend in-patient substance abuse rehabilitation, something she had failed to complete during the pendency of the case. Despite Mother's good intentions, her testimony indicates that she understood that relapse was something that could easily happen without intensive assistance—something that would subject J.S. to emotional and physical danger.

Linea Weaver, the Court Appointed Special Advocate supervisor for Harrison, Panola, and Marion Counties, opined that Mother's parental rights to J.S. should be terminated because,

13

although the Department offered her services so she could reunite with J.S., Mother did not take advantage of those services. These *Holley* factors weigh in favor of termination.

With respect to the fourth *Holley* factor, the record reflects that Mother's parental abilities were lacking—primarily due to her ongoing drug addiction. Mother testified that, before the Department's removal of J.S., both she and Grandmother smoked methamphetamine. Mother smoked methamphetamine outside of the home while Grandmother was inside the house with J.S. J.S.'s foster parents, who would like to adopt him, have—according to Weaver—raised a happy, healthy boy who was "doing great" in his foster home. Mother also testified that the foster parents have done "an awesome job taking care of" J.S., and, although she wanted to be reunited with J.S., she believed that he would have a better life with his foster parents.

Considering the *Holley* factors, and in light of all of the evidence, we conclude that the trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in J.S.'s best interests. As a result, we overrule this issue.

We affirm the trial court's judgment.


Josh R. Morriss, III
Chief Justice

Date Submitted:     March 15, 2021
Date Decided:       April 7, 2021

14