

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-14-00052-CV

_____


IN THE INTEREST OF P.D. AND C.D., CHILDREN


On Appeal from the 402nd Judicial District Court
Wood County, Texas
Trial Court No. 2013-378


Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

After many years' use of methamphetamine and the resulting chaotic home life, Amy[1] lost her parental rights to her young children, P.D. and C.D., in a bench trial in Wood County.[2] On appeal, Amy challenges the legal and factual sufficiency of the evidence to support selected elements of the trial court's order of termination under grounds set out in subsections (D), (E), (I), (O), and (P) of Section 161.001(1) of the Texas Family Code.[3] Amy does not contest the trial court's finding that termination is in the best interests of the children, but attacks only the trial court's findings of the above grounds for termination.[4] We affirm the judgment of the trial court because the evidence is sufficient to support the order of termination under Section 161.001(1)(O).[5]

Parental rights may be terminated if the parent has

failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been

[1]We will refer to appellant as "Amy" and the children as "P.D." and "C.D." *See* TEX. R. APP. P. 9.8.

[2]The trial court also terminated the parental rights of each of the fathers of P.D. and C.D., who have not appealed.

[3]The trial court's order of termination found that there was clear and convincing evidence to support termination of Amy's parental rights under those five grounds and that termination was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(1) (D), (E), (I), (O) and (P); § 161.001(2) (West 2014). The trial court also entered findings of facts and conclusions of law finding the same.

[4]Under grounds (D), (E), and (P), all requiring proof, in some way, that the children were endangered, Amy argues that there is insufficient proof of endangerment. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E), & (P). Ground (I) involves "contumaciously" refusing to submit to a court order, and Amy asserts that the evidence does not demonstrate that her limited failure to comply was contumacious, that is, stubborn or willful. *See* TEX. FAM. CODE ANN. § 161.001(1)(I). Because we find sufficient evidence to establish ground (O), we do not reach these arguments. *See* TEX. FAM. CODE ANN. § 161.001(1)(O).

[5]When there is a finding that the termination is in the best interest of the child, only one statutory ground under Section 161.001(1) is necessary to support a judgment of termination. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *In re O.R.F.*, 417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied).

in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child . . . .

TEX. FAM. CODE ANN. § 161.001(1)(O).

On appeal, Amy does not contest that she failed to comply with the provisions of the court order establishing the actions she needed to take to obtain the return of the children.[6] Amy challenges only the legal and factual sufficiency of the evidence supporting the finding that the children had been removed "as a result of abuse or neglect."[7] Therefore, we consider the evidence relating to the original removal of the children to determine whether it is sufficient to support the trial court's finding that they were removed as a result of abuse or neglect. *See, e.g.*, *In re E.C.R.*, 402 S.W.3d 239 (Tex. 2013).

Texas courts have historically shown great respect for the biological bond between parent and child, recognizing that the "'natural right which exists between parents and their children is one of constitutional dimensions.'" *In re J.W.T.*, 872 S.W.2d 189, 194–95 (Tex. 1994) (quoting *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976)). They also recognize, however, that "the rights of natural parents are not absolute; protection of the child is paramount. . . . The rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *A.V.*, 113 S.W.3d at 361. The child's emotional and physical interests will not be sacrificed merely to preserve parental rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

---

[6]The record reveals that Amy failed to comply with at least three of the required actions, including continuing with counseling and following all recommendations of the counselor, submitting to all drug tests requested by the Department or ordered by the court, and maintaining a stable home and income.

[7]Amy's briefing on this issue is sparse, at best. In the interest of justice and since the State has fully briefed this point, we will address it.

Terminating parental rights under the Texas Family Code requires proof by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(1) (West 2014). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). When the legal sufficiency of evidence is challenged, we "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *J.F.C.*, 96 S.W.3d at 266. In a bench trial, "we assume that the trial court resolved disputed facts in favor of its finding if a reasonable fact-finder could do so, but disregard all evidence that a reasonable fact-finder could have disbelieved or found to have been incredible." *In re K.W.*, 335 S.W.3d 767, 770 (Tex. App.—Texarkana 2011, no pet.) (citing *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009)).

In reviewing for factual sufficiency, we also consider disputed and conflicting evidence. If we find, after reviewing the entire record, "the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 344.

We turn to the underlying facts in this record.

The petition for temporary managing conservatorship was supported by an affidavit recounting the facts requiring the removal of P.D. and C.D. In addition, Teresa Huffine, the Child Protective Services caseworker who performed the initial investigation testified at the final

4

hearing regarding the events leading up to the removal of the children. The evidence shows Amy and her children came to the attention of CPS in May 2013, when it received a report of a possible failure to seek medical treatment concerning C.D. At that time, Amy and her children were staying with her grandmother. Huffine investigated the report; interviewed Amy, her grandmother, and her mother; and observed the children. Huffine also observed that the home was clean and had working utilities and ample food and toys for the children.

During the initial investigation, Amy admitted using methamphetamine and alcohol and signed a substance abuse acknowledgement. A safety plan was instituted with Amy's grandmother as the supervised contact. Amy also agreed that she would refrain from any further use of illegal substances. During the two months before removal of the children, several incidents of domestic violence occurred. In one instance, Amy's mother was accused of criminal trespass by the Wood County Sheriff's Department. In another visit to the home, Huffine was accompanied by a deputy, and Amy and her grandmother were hostile toward each other, with the grandmother stating she would protect herself with a gun or knife if necessary. Two days before removal of the children, Amy's grandmother said she was planning on evicting Amy. The grandmother claimed there were two more people living at the house that were not supposed to be there and that there had been another instance of domestic dispute, again mentioning the use of a gun to protect herself if necessary. Two days before the removal of the children, Huffine interviewed Amy's cousin, who was frequently at the home. The cousin advised that Amy and her grandmother argue constantly and that "it can be very serious at times." P.D., who was four years old, and C.D., who was four and one-half months, were in the home during these

5

arguments. Huffine testified that, although these arguments were non-physical, they still exposed the children to domestic violence and posed a threat to their emotional well-being and cognitive development. Huffine was also concerned that the escalating arguments might turn physical and that they posed a danger to the children. At the final hearing, Amy testified that her grandmother verbally abused her in front of her children. Amy denied that she had mood swings or anger issues at that time, but admitted they had arguments.

On three of the home visits, there were persons present in the home that Huffine recognized from other, unrelated, CPS cases. All were known to her to use drugs and have criminal histories. She continued to counsel Amy on making better decisions on whom she allowed in the home, but to no avail. On her last visit to the house, Huffine learned that another woman had moved into the home. This woman had moved from another home that had a history of drug use and domestic violence. Earlier that day, Amy and her grandmother had another altercation in front of the children, and her grandmother called CPS. On that visit, she also learned from Amy's cousin that there was a regular stream of visits by men to see Amy in her room.

During the course of the investigation, Amy admitted "recreational" use of alcohol and methamphetamine that had continued for about five years, although she stated she used it away from home. In the two months before removal, Amy admitted that she continued to use methamphetamine and that she was involved with people with criminal histories who also used drugs. Although Huffine did not believe Amy was using drugs inside the home, she testified that, in her experience, the effects of methamphetamine use may last several days and affect

6

parenting by clouding judgment. Amy denied that her drug use affected her parenting skills or posed any danger to her children. She also did not recognize that the presence of drug users with criminal histories posed any kind of threat or risk of harm to her children. However, at the final hearing she acknowledged that she now sees that her drug use may have had an effect on how she took care of her children. She also agreed that, when she was using methamphetamine, her judgment was impaired as far as decisions she made regarding her children.

Bonnie McBride, a licensed clinical social worker and family therapist who counseled Amy, testified that Amy's drug use and home environment endangered the children's emotional and physical well-being. She agreed that Amy's drug use, the instability of her home life, and the domestic violence endangered the physical health and emotional well-being of the children. Dawn McClain, a licensed professional counselor, testified that Amy's methamphetamine use and the domestic violence in the home would place the children in danger and harm them emotionally.

After two months, Amy still would not adhere to the safety plan, and she would not acknowledge that her decisions and conduct might expose the children to danger. On July 9, 2013, another investigator, Laura Cranford, visited with both Amy and her grandmother in the home. During that visit, Amy admitted she had used methamphetamine within the previous two days. Cranford also learned that Amy's grandmother was not complying with the safety plan by allowing Amy unsupervised contact with the children. The visit ended with Amy and her grandmother getting into a heated argument. On July 10, 2013, the Department of Protective and Family Services (the Department) determined that the increasing domestic violence, Amy's

continued drug use, and the failure of Amy and her grandmother to adhere to the safety plan by allowing people who are known illegal drug users with criminal histories to visit and reside in the home posed a risk of harm to the children. So, the Department removed the children from the home pursuant to the emergency provisions of the Texas Family Code. *See* TEX. FAM. CODE ANN. § 262.104 (West 2014). The same day the Department filed a petition seeking temporary managing conservatorship of the children. The trial court entered emergency temporary orders giving the Department temporary managing conservatorship and setting a full adversary hearing July 22, 2013.

On July 22, 2013, a full adversary hearing was held, and Amy appeared in person and through her attorney. After the hearing, the trial court entered temporary orders in which it found, *inter alia*, (1) that there was a danger to the physical health or safety of the children caused by an act or failure to act of the person entitled to possession, (2) that it was contrary to the welfare of the children to remain in the home, and (3) that there was a substantial risk of continuing danger if the children remained in the home. The trial court also entered orders that established specific actions that Amy needed to take to obtain the return of the children. These actions included (1) submitting to a psychological or psychosocial evaluation and following all recommendations of the evaluation; (2) attending counseling sessions until the counselor determined no further sessions were necessary; (3) attending domestic violence counseling sessions until the counselor determined no further sessions were necessary; (4) attending and successfully completing parenting classes; (5) submitting to an alcohol and drug assessment and following all recommendations; (6) submitting to drug tests as requested by the Department or

8

ordered by the court; (7) obtaining and maintaining a stable home and income; and (8) complying with each requirement of the Department's service plan. The Department's service plan included all of the court-ordered services and also required her to maintain a stable home and employment for six months, complete an anger management course, and participate in Narcotics Anonymous and Alcoholics Anonymous meetings at least three times a week and provide documentation of attendance to the Department.

As Amy correctly asserts, Section 161.001(1)(O) requires that the removal of the children under Chapter 262 of the Texas Family Code be for "abuse or neglect." TEX. FAM. CODE ANN. § 161.001(1)(O). The Texas Supreme Court has recently concluded that, under Chapter 262 and this subsection, abuse or neglect "necessarily includes the risk or threats of the environment in which the child is placed." *E.C.R.*, 402 S.W.3d at 248. As the court recognized, the definitions of abuse and neglect under Chapter 261 "inform" the meaning of abuse and neglect under Chapter 262. *Id.* Under Chapter 261, "abuse" includes "the current use by a person of a controlled substance . . . in a manner or to the extent that the use results in physical, mental or emotional injury to a child." TEX. FAM. CODE ANN. § 261.001(1)(I) (West 2014). "Neglect" includes "placing a child in or failing to remove a child from a situation that a reasonable person would realize requires judgment or actions beyond the child's level of maturity, physical condition, or mental abilities and that results in . . . a substantial risk of immediate harm to the child." TEX. FAM. CODE ANN. § 261.001(4)(B)(i) (West 2014). Further, Section 262.104 allows the emergency removal of a child when "on information furnished by another that has been corroborated by personal knowledge of facts and all of which taken together would lead a person

9

of ordinary prudence and caution to believe that there is an immediate danger to the physical health or safety of the child." TEX. FAM. CODE ANN. § 262.104(a)(2).

In this case, there is abundant evidence that Amy's continued substance abuse and her allowing other drug users and persons with criminal histories into the home created an environment that placed the children at risk of emotional and physical harm. Amy admitted as much at the final hearing. In addition, as set forth in the supporting affidavit and the testimony of Huffine, the increasing level of altercations between Amy and her grandmother, to the extent her grandmother expressed on more than one occasion the need to protect herself with firearms, would lead a person of ordinary prudence to believe there was an immediate danger to the children. Thus, considering this evidence, a reasonable fact-finder could have formed a firm belief or conviction that grounds existed to remove the children for abuse or neglect.

As noted earlier, Amy does not contest that she failed to comply with the provisions of the trial court's order "that specifically established the actions necessary for [her] to obtain the return of [the children]." *See* TEX. FAM. CODE ANN. § 161.001(1)(O). It is also undisputed that the children were in the Department's custody for over nine months. Further, the record conclusively establishes that the children were removed for abuse or neglect under Chapter 262 of the Texas Family Code. Therefore, we find that the State established the conduct necessary to terminate Amy's parental rights under Section 161.001(1)(O). Since we have found that the State established at least one of the predicate acts under Section 161.001(1), we need not consider Amy's other alleged errors.

We affirm the judgment of the trial court.

Josh R. Morriss III
Chief Justice

Date Submitted:     October 14, 2014
Date Decided:       October 29, 2014