# In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-15-00025-CV

_____

### IN THE INTEREST OF Z.J.J. AND Z.J.

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-207,449-D**

### MEMORANDUM OPINION

In this accelerated appeal, S.D. (the Mother) appeals the trial court's order of termination, terminating her parental rights to her children Z.J.J. and Z.J.[1] The Mother raises two issues on appeal.[2] We affirm the trial court's judgment.

### Procedural and Factual Background

In December of 2011, the Department of Family and Protective Services (the Department) filed a suit affecting the parent-child relationship, wherein the

---

[1] To protect the identity of the minors, we have not used the names of the children, parents, or other family members. *See* Tex. R. App. P. 9.8.

[2] Z.J.S. (the Father) is not a party to this appeal.

1

Department sought to terminate the Mother and Z.J.S.'s (the Father) parental rights to Z.J.J. and Z.J. The trial court awarded the Department temporary, primary conservatorship of the children. On June 9, 2012, the Department placed Z.J.J. and Z.J. with S.A.C. and A.L.C. (the Foster Parents). On October 28, 2014, the Foster Parents filed their petition in intervention seeking primary conservatorship, termination of the Mother and the Father's rights, and adoption of the children. The trial court granted the Foster Parent's intervention. The Department dismissed its case and is no longer a party to the suit.

The trial court appointed the children an attorney ad litem. Based on his investigation, the attorney ad litem recommended that the trial court terminate the Mother's parental rights and indicated his belief that termination was in the children's best interest. After a bench trial, the trial court terminated the parental rights of the Mother and the Father to the children and appointed the Foster Parents sole managing conservators of Z.J.J. and Z.J. At the time of trial, Z.J.J. was five years old, and Z.J. was three years old.

## Legal and Factual Sufficiency

In her first issue, the Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's judgment. In our review of the legal sufficiency of the evidence in a parental rights termination case, we "look at all the

evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We assume that the finder of fact resolved the disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*. We are not required to disregard all evidence that does not support the finding. *Id*. If no reasonable finder of fact could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id*.

In our review of the factual sufficiency of the evidence in a parental rights termination case, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id*. (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). As the reviewing court, we must answer "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the . . . allegations.'" *Id*. (quoting *C.H.*, 89 S.W.3d at 25). We consider whether a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id*. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or

3

conviction, then the evidence is factually insufficient." *Id*. We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id*. at 109.

## Predicate Grounds for Termination

The trial court found that the Mother (1) knowingly placed or knowingly allowed Z.J.J. and Z.J. to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) engaged in conduct or knowingly placed Z.J.J. and Z.J. with persons who engaged in conduct that endangered their physical or emotional well-being, and (3) failed to support Z.J.J. and Z.J. in accordance with her ability during a period of one year ending within six months of the date of the filing of the petition. For the reasons discussed below, we conclude that the record contains clear and convincing evidence to support the trial court's findings that the Mother engaged in conduct or knowingly placed Z.J.J. and Z.J. with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(1)(E) (West 2014).

To terminate a parent-child relationship, it must be shown by clear and convincing evidence that the parent has committed at least one of the predicate acts

4

listed in section 161.001(1) of the Texas Family Code and that termination is in the best interest of the child. *Id*. § 161.001(1), (2). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id*. § 101.007.

Subsection 161.001(1)(E) permits termination when clear and convincing evidence shows that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id*. § 161.001(1)(E). "'[E]ndanger'" means "to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Termination under subsection 161.001(1)(E) must be based on more than a single act or omission; there must be a voluntary, deliberate, and conscious course of conduct by the parent. *In re A.D.*, No. 09-14-00280-CV, 2014 WL 6984269, at *6 (Tex. App.—Beaumont Dec. 11, 2014, no pet.) (mem. op.); *see also In re C.A.B.*, 289 S.W.3d 874, 883 (Tex. App.—Houston [14th Dist.] 2009, no pet.). In our evaluation of this predicate ground for termination, we consider evidence of conduct that occurred both before and after a child's birth. *A.D.*, 2014 WL 6984269, at *6. It is not necessary that the parent's conduct be directed at the child or that the child actually suffers an injury. *Boyd*, 727 S.W.2d at 533. Because

5

illegal drug use exposes a child to the possibility that the parent may be impaired or imprisoned, such use may support termination under subsection 161.001(1)(E). *Walker v. Tex. Dep't Family & Protective Servs.*, 312 S.W.3d 608, 617-18 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re Z.C.*, 280 S.W.3d 470, 474 (Tex. App.—Fort Worth 2009, pet. denied). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Domestic violence may also support an endangerment finding, even if the violence is not directed at the child. *J.O.A.*, 283 S.W.3d at 346; *see also In re C.J.O.*, 325 S.W.3d 261, 265 (Tex. App.—Eastland 2010, pet. denied) ("Domestic violence may be considered evidence of endangerment. If a parent abuses or neglects the other parent or other children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct.") (citations omitted). To determine whether subsection (E) supports termination, we look to the Mother's conduct both before and after the children's removal from her care. *See In re O.R.F.*, 417 S.W.3d 24, 37 & n.11 (Tex. App.—Texarkana 2013, pet. denied).

Child Protective Services (CPS) first removed Z.J.J. from the Mother's care in May of 2011 when Z.J.J., nearly two years old, had been found outside of the residence alone and unsupervised. The Mother testified that she left Z.J.J. in her cousin's care while the Mother went to work. She explained that her cousin was thirty-three years old at the time and had moved in with the Mother temporarily to get away from an abusive boyfriend. According to the Mother, the boyfriend found out that the cousin was staying with the Mother. The boyfriend came over to the Mother's apartment and the cousin left with him, leaving Z.J.J. without adult supervision. The Mother agreed that she made a poor choice to leave Z.J.J. with her cousin.

Between May and November of 2011, the Mother, while pregnant with Z.J., tested positive for PCP on three separate occasions, and tested positive for Xanax once. Z.J.J. was in the Mother's care during this time. When the Mother gave birth to Z.J. in December of 2011, the Mother tested positive for PCP.

The Mother testified she first used marijuana when she was seventeen years old and first used PCP when she was twenty-five years old. She admitted that she used marijuana and PCP during her pregnancy with Z.J. She testified that she regrets daily that she ingested PCP while she was pregnant with Z.J. The Mother admitted that she engaged in drug use while the children were in her care.

7

After the birth of Z.J., because of the Mother's continued drug use, unstable employment, and unstable housing history, CPS removed Z.J.J. and Z.J. from the Mother's care in January of 2012 and placed the children in a foster home. At first, the Mother participated in and completed items identified in her service plan. The Mother completed a drug treatment program, a parenting class, an anger management class, and a psychological examination. As a result of the Mother's progress, in June of 2012, CPS returned Z.J.J. and Z.J. to the Mother. The children remained in the Mother's care for about three days before CPS had to remove them when the Mother was arrested after a traffic stop for outstanding warrants. The children were in the vehicle with the Mother when she was arrested. At the time of her arrest, marijuana was found inside the vehicle the Mother was driving. The Mother denied knowing the marijuana was in the vehicle and denied that it belonged to her. The Mother admitted that her brother, who has a criminal history related to drugs, and her cousin, who also has a criminal history, were in the vehicle with her and her children when she was pulled over. She denied knowing that her brother and cousin had drugs in their possession. According to the Mother, she was not arrested for possession of drugs at that time.

After the second removal, the Mother received a new service plan, but failed to comply with its terms. Sometime after June of 2012, while CPS was monitoring

the Mother, the Mother tested positive for narcotic drugs— specifically, hydrocodone—during a visitation. The CPS worker assigned to the children testified that in her opinion, the Mother lacks the ability or capacity to make appropriate decisions to keep her children safe.

The Mother testified that she no longer uses illegal drugs and indicated that she was willing to have a drug test. She testified that she has maintained sobriety since 2012. The Mother explained she had legitimately taken hydrocodone for a toothache. According to the Mother, she had received a prescription for hydrocodone, but because she did not have insurance, she did not fill her prescription and instead took a hydrocodone pill from a friend. However, the Mother did not offer a written prescription into evidence to support her contention.

The Mother presented other witnesses to corroborate her testimony regarding her current sobriety. The Mother's sister testified that the Mother was no longer abusing drugs and had been clean for two years. At the time of trial, the judge heard testimony that the Mother's sister was under CPS investigation herself due to the death of her own child. One of the Mother's friends also testified that she believed the Mother lived a life of sobriety. The Mother's friend indicated that she also believed the Mother to be a very charitable person and explained that the Mother has given her money, gifts, food, and clothing for the friend's child. The

Mother's uncle testified that the Mother leads a drug-free life. The uncle had been incarcerated for sixteen years for a murder conviction and was released in 2012.

The Mother testified that the Father accompanied her to some of the visits she had with the children. When asked if the Father was an appropriate person for the children to be around, the Mother responded that he is their father, but later admitted that he was not appropriate. She testified that her attorney accidentally sent the visitation information to the Father's address instead of hers, so it was not her fault that the children were exposed to the Father.

A CPS employee assigned to the Mother's case testified that the Mother continues to find herself entangled in criminal activities. The Mother was arrested in March of 2011 for a DWI. The Mother received probation for the DWI, but because she had failed to comply with the terms of her probation, she was arrested on a revocation warrant in June 2012. The Mother was arrested and convicted in 2012 for domestic violence.

The record also reflects that the Mother has anger issues. There is evidence in the record that at least one witness observed the Mother's angry outbursts after a visitation with the children. This outburst occurred after the Mother had participated in anger management classes. The Mother denied being angry during or after her visits with the children. The Mother attempted to explain her language

by stating to the court that everyone uses curse words and that her circumstances justified the use of such words. Other witnesses testified that the Mother's interaction with the children during the visits was appropriate, and they did not report observing any outbursts. The children's foster mother testified that the children seem antsy, nervous, and afraid after their visits with the Mother. She testified that the Mother's parenting is very different than hers, and she explained that the Mother is rough, loud, and aggressive with the children. She testified that after the visits, Z.J.J. is afraid that the Mother will come and try to get him. The foster mother testified that she is personally afraid of the Mother. The Mother admitted to making bad choices in the past, but claimed that she has changed and that she loves her children and wants them to be with her.

From our review of the record, we conclude the evidence supports the trial court's endangerment finding under subsection (E). The record shows that the Mother has a history of using illegal drugs. The Mother used illegal drugs before the children's removal, when Z.J.J. was in her possession, and while she was pregnant with Z.J. The Mother admitted that she was under the influence of drugs while Z.J.J. was in her care. Even after the children had been removed from her and her parental relationship with the children was in jeopardy, the Mother tested positive for narcotic drug use. The trial court could have credited the evidence of

11

the Mother's illegal drug use and other criminal activity, as well as her continued contact with others that had drug-related and criminal offenses, to find that the Mother engaged in a conscious course of conduct that endangered her children.

Viewing the evidence in the light most favorable to the endangerment finding under subsection (E), we conclude the trial court could have formed a firm belief or conviction that the Mother "engaged in conduct . . . which endanger[ed] the physical or emotional well-being of the child[ren]." *See* Tex. Fam. Code Ann. § 161.001(1)(E); *J.F.C.*, 96 S.W.3d at 266. Furthermore, based on our review of the record, we conclude that the evidence is such that the trial court reasonably could have formed a firm belief or conviction about the truth of the allegations against the Mother. We conclude that the evidence is legally and factually sufficient to support the trial court's finding under section 161.001(1)(E).[3]

**Best Interest of the Children**

The trial court found that termination was in the children's best interest. The Mother contends the evidence is legally and factually insufficient to support this finding. Regarding the children's best interest, we consider a non-exhaustive list of

---

[3] We need not address the sufficiency of the evidence to support a violation of subsections (1)(D) or (F). *See In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.) ("If multiple predicate grounds are found by the trial court, we will affirm based on any one ground because only one is necessary for termination of parental rights.").

factors: (1) desires of the children; (2) emotional and physical needs of the children now and in the future; (3) emotional and physical danger to the children now and in the future; (4) parental abilities of the individual seeking custody; (5) programs available to assist this individual to promote the best interest of the children; (6) plans for the children by this individual or by the agency seeking custody; (7) stability of the home or proposed placement; (8) acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307(b) (West 2014). In reviewing the trial court's decision to terminate a parent's relationship with a child, we consider that "there is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). The party seeking termination need not prove that each *Holley* factor favors termination. *C.H.*, 89 S.W.3d at 27. A trial court's best interest finding "is not dependent upon, or equivalent to, a finding that the child has been harmed by abuse or neglect or is in danger of such harm[,]" but rather it "is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013).

As explained above, the Mother has a history of using illegal drugs; there is evidence that she did so while she had custody of Z.J.J., while she was pregnant with Z.J., and after the children's removal. A parent's drug use also supports a finding that termination is in the best interest of the children. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.). Because drug-related conduct is a significant factor, the factfinder can give great weight to such evidence when it is present. *In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.).

The evidence also supports that the Mother lacked stable living arrangements for the children both before and throughout the pendency of this case. There is evidence in the record that the Mother had a number of different residences and, at least on one occasion, did not have independent housing. At the time of trial, however, the Mother testified that she had obtained government housing of a three-bedroom apartment, which would allow the children to have their own furnished bedrooms.

Additionally, the Mother had not demonstrated that she had the financial ability to provide for the children. At the time of trial, the Mother was unemployed. The Mother has a history of unstable employment. The Mother testified that she was starting school in January to become a process operator. She testified that she

14

would look for part-time work that did not conflict with her school schedule. The Mother qualified for a Pell Grant and had plans to use those funds to pay for her education.

As a consequence of the children's removal, the Mother had little opportunity to bond with Z.J.J. and Z.J. However, the record demonstrated that both Z.J.J. and Z.J. have bonded with the Foster Parents with whom they had been living for nearly three years at the time of trial. The foster mother testified that the children were placed in her home June 9, 2012, and at that time, Z.J.J. was almost three years old and Z.J. was five months old. She testified that the children are attached to them. The foster father also testified that he has bonded with the children. A number of witnesses testified that the Foster Parents have provided a safe, appropriate, stable home for the children. Other witnesses corroborated the foster mother's testimony that the children have bonded with them. The Mother even agreed that Z.J. has spent most of her life with the Foster Parents and has bonded with them. The Mother testified that the Foster Parents have been good caregivers to her children.

The Mother countered with testimony that she has also bonded with the children. The Mother testified that Z.J.J. has told her that he wants to come home. The Mother presented other witnesses to corroborate her testimony. However, the

foster mother testified that after visiting with the Mother, Z.J.J. becomes fearful that the Mother will come and try to take him from the Foster Parents.

The Foster Parents want to adopt the children if the parental rights of the Mother and the Father are terminated. The testimony at trial supports that the Foster Parents demonstrate the appropriate love, care, and affection the children need. According to the foster mother, the children are doing well in their home.

After considering the relevant *Holley* factors under the appropriate standards of review, we conclude the evidence supports the trial court's best-interest finding. Specifically, when we view the evidence in the light most favorable to the best interest finding, we conclude the trial court reasonably could have formed a firm belief or conviction that termination was in the best interest of Z.J.J. and Z.J. Based on our review of the entire record, we further conclude that the trial court could reasonably have formed a firm belief or conviction that it would be in the best interest of both children for the Mother's parental rights to be terminated. The evidence is both legally and factually sufficient to support the best interest finding. We overrule the Mother's first issue.

In her second issue, the Mother argues that the trial court's judgment erroneously indicates that the children's father was present and appeared in person at the proceedings. The Mother does not contend that the Father did not receive

proper notice. In fact, in her brief she states, "All parties were properly served with notice and citation." The Father is not a party to this appeal. Therefore, we overrule this issue.

Having overruled all of the Mother's issues on appeal, we affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on June 26, 2015
Opinion Delivered July 30, 2015

Before McKeithen, C.J., Kreger and Johnson, JJ.

17