In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-17-00390-CV
_____

IN THE INTEREST OF B.A.M.

On Appeal from the 418th District Court
Montgomery County, Texas
Trial Cause No. 14-04-03839-CV

**MEMORANDUM OPINION**

This is an appeal from a judgment that resulted in the termination of the parent-child relationship between B.A.M.[1] and his father. B.A.M.'s father (Father) presents seven appellate issues, and he argues that the jury's decision to terminate

---

[1] We identify minors in appeals in parental-rights termination cases by using an alias, in this case initials, to protect the minor's identity. *See* Tex. R. App. P. 9.8. Additionally, only the child's father appealed from the jury's verdict; the child's mother, although a party to the proceeding in the court below, did not pursue an appeal.

1

his parental rights to B.A.M. should be overturned. In issues one through four, Father argues that the evidence is legally and factually insufficient to support the jury's decision to terminate his parent-child relationship with B.A.M. In issue five, Father argues that the evidence the jury considered during the trial is legally and factually insufficient to support the jury's best-interest finding. In issue six, Father complains the trial court should have excluded the testimony of one of the caseworkers employed by the Texas Department of Family and Protective Services (the Department), who the trial court allowed to testify even though the Department failed to produce several documents the caseworker reviewed before testifying during the trial. In issue seven, Father argues the trial court should have sustained an objection he made to the argument made by the Department's attorney when she suggested that Father had the right to disregard a court order giving Mother possessory rights, which allowed her to have visitation, by refusing to allow B.A.M. to go to Mother's home given his alleged knowledge about Mother's "serious mental health issues[.]" For the reasons explained below, we affirm the final judgment terminating Father's parental rights to B.A.M.

Background Relevant to Issue Four, Which Challenges the Jury's
Decision to Terminate Father's Parental Rights Based on Father's
Alleged Failure to Comply with His Family Service Plan

At the conclusion of the trial, the jury answered a broad form issue that asked whether Father's parental rights to B.A.M. should be terminated. The instructions that were submitted in conjunction with this broad form issue advised the jury that Father's parent-child relationship could be terminated on four separate grounds, if the jury determined the Department, by clear and convincing evidence, had proven that Father (1) knowingly placed or allowed B.A.M. to remain in conditions or surroundings that endangered B.A.M.'s physical or emotional well-begin, (2) engaged in conduct or knowingly placed B.A.M. with persons who engaged in conduct that endangered B.A.M.'s physical or emotional well-being, (3) failed to support B.A.M. based upon his ability to do so during a period of one year, ending within six months of the date the Department filed suit, or (4) failed to comply with the provisions of a court order that specifically established the actions necessary for the Department to return B.A.M. to Father's custody.

We limit our discussion of the background information necessary to explain our resolution of Father's fourth issue, which asserts the Department failed to satisfactorily establish that Father complied with the requirements of his court-ordered, family service plan. We focus on issue four because should that issue be

3

resolved in the Department's favor, it would not then be necessary to reach Father's first three issues, as these issues concern alternative theories on which the jury could have answered the broad form issue in the Department's favor.

The record shows that in early April 2016, the Department filed suit alleging that Father's parental rights to B.A.M. should be terminated on several grounds. One of the Department's theories was that Father had failed to comply with the provisions of a court-ordered, family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O) (West Supp. 2017). In Father's appellate brief, Father has not argued the Department failed to establish that it did not have custody of B.A.M. for at least nine months after B.A.M. was removed from Father's custody. Additionally, Father has not argued the evidence in the trial failed to sufficiently establish that when B.A.M. was removed from Mother's home,[2] she was abusing or neglecting B.A.M. *Id.* Instead, Father argues in his brief that the evidence before the jury failed to sufficiently

---

[2] In April 2016, the trial court authorized the Department to remove B.A.M. from Mother's care based on the Department's allegations and evidence showing that Mother had mental health issues that the Department claimed endangered B.A.M. and that she was neglecting B.A.M. during a period of time that Father allowed B.A.M. to live in Mother's home, a period of approximately two months before the emergency removal occurred. Approximately one year before the emergency removal occurred, the court had appointed Father and Mother as B.A.M.'s joint managing conservators, and the court gave Father the right to designate B.A.M.'s primary residence.

establish that he failed to comply with the material requirements in his family service plan. According to Father, the Department failed to introduce the family service plan into evidence during the trial, failed to introduce the order the trial court signed obligating Father to comply with a family service plan, and produced only one witness during the trial to address whether Father failed to comply with his family service plan. Additionally, Father argues that the evidence before the jury showed that he attempted to comply with the plan. He suggests that any evidence showing that he did not comply with the plan does not outweigh the evidence showing that he did comply. Father's brief on issue four concludes that "[c]lear and [c]onvincing evidence of what the plan or order [required] was never provided to the jury."

B.A.M. was almost six years old when the Department's case was tried.[3] Born in 2011, B.A.M. lived with his parents until he was approximately one year old. At that time, Father and Mother separated, and Father and B.A.M. started living with Father's mother in her home. For the next three and one-half years, B.A.M. lived with his paternal grandmother, and with Father, while Mother visited B.A.M. as allowed by the standard visitation schedule that controlled her parental rights, which

---

[3] The same jury that found Father's rights to B.A.M. should be terminated also found that Mother's parental rights to B.A.M. should be terminated. Mother did not appeal from the jury's verdict that resulted in the termination of her parental rights to B.A.M.

allowed B.A.M. to stay with Mother every first, third, and fifth weekend. During the spring of 2016, Father began working in Beaumont. Around that time, B.A.M. began living with Mother in Mother's home.

In April 2016, the Department filed a petition asking that the trial court authorize B.A.M.'s removal from Mother's home and that the court make the Department B.A.M's temporary managing conservator. The Department alleged that B.A.M. was living with his mother and several of Mother's other children under circumstances where Mother, due to her mental illness, endangered B.A.M.'s physical and emotional well-being. The Department supported these allegations with an affidavit of a caseworker, and her affidavit indicates that the Department received information indicating that Mother was receiving in-patient psychiatric treatment and that she had reportedly made statements to indicate she was having inappropriate sexual thoughts about one of her children (not B.A.M.), a two-year-old male. The affidavit explains that the Department had on several prior occasions investigated Mother regarding her ability to care for her children: these investigations revealed that Mother's problems were mostly due to problems she had "in managing her mental illness." The Department alleged that an immediate danger to the physical health or safety of B.A.M. existed, and it requested that the court authorize the Department to remove B.A.M. immediately and to take B.A.M. into its possession.

The trial court granted the Department's request, authorized the Department to remove B.A.M. from Mother's home, and the court named the Department as B.A.M.'s temporary sole managing conservator.

Approximately one week after the removal occurred, the trial court conducted an adversarial hearing to determine whether it should alter Mother's and Father's custodial rights to B.A.M. pending a trial on the merits of the Department's claims. Mother appeared at the adversarial hearing, but Father did not. At the conclusion of the adversarial hearing, the trial court ordered that subject to the Department's supervision, B.A.M. be placed with his paternal grandmother. The trial court also ordered Father to complete various tasks that included a requirement that he cooperate with the Department. The order conditioned Father's right to regain custody of B.A.M. on Father's compliance with the court's order, and the order required Father to complete a family service plan listing ten general items, together with a number of other, more specific tasks. The temporary order also required that Father comply with "each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit."

Father's family service plan included a requirement that he complete a drug and alcohol assessment. The order required that Father follow any recommendations following that assessment; that Father complete random urine tests, as directed by

7

the Department; and that he obtain and maintain safe, stable, and appropriate housing and employment during the entirety of the proceeding. Additionally, the language of the Father's family service plan informed him that his failure "to show up for random drug testing [would be] noted as a positive screening[.]"

In September 2016, the trial court conducted an initial permanency hearing in B.A.M.'s case. Father appeared at this hearing and was represented by counsel. Following the initial permanency hearing, the trial court approved Father's family service plan and ordered that Father complete the plan. *See* Tex. Fam. Code Ann. § 263.103(c), (d)(2) (West Supp. 2017) (explaining that, in certain circumstances, the Department may file an unsigned service plan, which becomes effective when the court orders that a parent comply with the plan). The initial permanency order indicates that B.A.M. was to continue to live with his paternal grandmother, but the court allowed Father to have supervised visitation with B.A.M.

In November 2016, the Department removed B.A.M. from his paternal grandmother's home because grandmother had allowed Father to have unsupervised visitation with B.A.M., and grandmother had failed to follow the Department's recommendations regarding B.A.M.'s counseling and medical care. The Department's case to terminate Mother's and Father's rights to B.A.M. went to trial on September 11, 2017. Eight witnesses were called to testify in the trial, all of whom

8

were called by the attorney representing the Department. Of these eight witnesses, only four of the witnesses directly addressed Father's family service plan at trial: (1) Father; (2) a caseworker who worked on Father's case for approximately two and one-half months, who was later promoted to a position supervising other caseworkers (Caseworker One); (3) the caseworker who was assigned to B.A.M.'s case when the Department's case was tried (Caseworker Two); and (4) the court-appointed special advocate (B.A.M.'s CASA), who the trial court selected as the volunteer advocate that it assigned to speak for B.A.M. so that he could be timely placed in a safe and permanent home.

We address the testimony of these four witnesses as the testimony relates to Father's court-ordered, family service plan. When Father testified, he acknowledged a past history of substance abuse, which involved his use of marijuana, methamphetamine, phencyclidine (PCP), and cocaine. During his testimony, Father agreed that he had suffered from one epileptic seizure due to his substance abuse. However, Father denied that he had ever used PCP or cocaine after B.A.M. was born, and he claimed that he used methamphetamine once. According to Father, his one-time use of methamphetamine explained why one of the urine tests he took at the Department's request was positive for methamphetamine. During Father's testimony, the trial court admitted three certificates into evidence. The certificates

9

indicate that Father completed classes on drug and substance abuse, classes in parenting, and individual counseling sessions. All of the certificates are dated September 9, 2017, which was only two days before the trial began.

Father also addressed his employment when he testified. Father's ability to demonstrate that he had stable employment is among the general tasks that are listed in his family service plan. Father testified that he had not had a full time job during the eight month period preceding the trial. However, Father testified that he had been working, but he stated that his work was "not over the table. I do tattoos." Father claimed that he made approximately $1200 per month from his work tattooing and from other various odd jobs, such as moving furniture and cutting grass. Father also addressed his living arrangements, and his proposed living arrangement with his mother if the jury decided to allow him to regain his custody over B.A.M. According to Father, for a period of time after the Department took B.A.M. into custody, he slept in his truck while it was parked in a lot near the Department's offices. Father explained at trial that he was living with his mother, and he claimed his mother had room for B.A.M. to live there too.

Father also outlined why he had not complied with various aspects of his family service plan. He testified that he never received a complete copy of his family service plan, but he acknowledged that the Department gave him parts of the plan.

10

Father testified that he could not read or write, and he asserted that although the Department made some effort to explain his plan to him, he did not understand the explanation the Department provided to him. Father acknowledged attending a family group conference in late May 2016, but he claimed the Department discussed only the goals that the Department established for B.A.M. during that meeting. According to Father, the Department did not go over the details of what he was required to do to satisfy the obligations imposed on him by his family service plan. Father claimed that he never understood what was expected of him based on the family service plan, and he testified that at the end of the May 2016 meeting the Department told him: "[G]ood luck. Figure it out."

Two of the Department's caseworkers, Caseworker One and Caseworker Two, addressed various aspects of Father's family service plan when they testified in the trial. Caseworker One explained during trial that she had worked on Father's case as a caseworker for approximately two and one-half months. While a caseworker on Father's case, Caseworker One met with Father for more than one hour during a permanency conference. According to Caseworker One, she discussed Father's duties and responsibilities under his family service plan with him in this meeting. Caseworker One stated that Father completed a drug and alcohol assessment that the Department required, but that following the assessment, Father

11

failed to "follow the recommendations of that drug and alcohol assessment." Caseworker One also testified that Father had a urinalysis test in October 2016, "which was positive for methamphetamines[,]" that Father had several negative urine tests following that result, and that Father, during her involvement with his case initially as a caseworker and then later as a supervisor over other caseworkers on Father's case, failed to submit to all of the urine tests the Department asked him to take. Caseworker One explained that Father's family service plan required that Father obtain outpatient treatment for substance abuse, but that Father had not sought outpatient treatment or substance abuse therapy from a counselor who was approved by the Department. Caseworker One also stated that Father never provided proof he was employed, and that he had not documented his sources of income. Caseworker One testified that Father never demonstrated that he could provide B.A.M. with a safe and stable home. When cross-examined by Father's attorney, Caseworker One testified that Father did not take several urine tests that the Department had directed Father to take. She further explained the Department required Father to get bi-weekly urine tests. When questioned by the attorney ad litem for B.A.M., Caseworker One testified that Father did not complete all of the requirements in his family service plan, and that she knew that Father was fully aware of what his plan required. Caseworker One expressed the opinion that Father could not provide

12

B.A.M. with a safe, stable, nonviolent, and drug-free home, and she stated that the Department's goal was for B.A.M. to be adopted by B.A.M.'s foster family.

Caseworker Two also addressed Father's compliance and knowledge about his family service plan. Caseworker Two explained that Father's family service plan required him to have intensive drug treatment, random urine tests, individual counseling, parenting classes, a psychological evaluation, individual mental health counseling, appropriate housing, employment, a support system, to attend a parent collaboration group meeting, and to cooperate with the Department. She stated that she was assigned to B.A.M.'s case approximately four months before the date the trial began. Caseworker Two testified that she met with Father after taking over his case. Caseworker Two explained that she went over Father's family service plan with him in her initial meeting with him, and that she explained the tasks Father was required to complete based on the requirements of his plan. According to Caseworker Two, Father never indicated that he did not understand his family service plan, and he seemed to understand what was expected of him. Caseworker Two testified that as of the date of the trial, Father had not provided the Department with documentation showing that he had complied with several of the requirements of his plan. For example, Caseworker Two explained that the Department required Father to appear for urine tests twice a month, but that Father had not submitted to

13

such tests at any time after she was assigned B.A.M.'s file. Caseworker Two testified that Father had not provided the Department with any proof that he was employed. According to Caseworker Two, Father was living with his mother when she took over B.A.M.'s file. Caseworker Two was also questioned about the certificates Father's attorney introduced during the trial, and she stated that she was unfamiliar with the facility listed on the certificates and that she had looked at the Department's records but found nothing that indicated the Department had ever authorized Father to be seen at the facility named on the certificates. Caseworker Two explained why it was important that parents use a Department approved facility for any therapies they are required to obtain under their family service plans, explaining that the Department is expected to pay for this type of treatment and that the bills from these facilities, when sent to the Department, allowed the Department to know that parents were completing the tasks required by their plans.

The CASA assigned to B.A.M.'s case also addressed Father's non-compliance with his family service plan. The evidence showed the court appointed the CASA representative to B.A.M. in April 2016, and that the CASA visited B.A.M. monthly after she was appointed. The CASA testified she was present twice a month when B.A.M. visited his parents. According to the CASA, Father was very upset and angry when she was present during his visits with B.A.M. However, according to

14

the CASA, Father's last three visits with B.A.M. had gone well. Nonetheless, the CASA explained that Father had not visited B.A.M. during his last scheduled visit before the trial. The CASA expressed her opinion that although Father appeared to love B.A.M., she was concerned about Father's lack of stability given that Father had not completed the requirements of his family service plan, noting in particular that he did not comply with the random urine tests in his plan. The CASA also stated that she would like to see Father maintain a stable job, have a stable place to live, and to improve his ability to control his anger and outbursts before she would recommend that B.A.M. be returned to him. At one point in the trial, the CASA stated that she felt that B.A.M. should continue in his current placement with his foster family, where he was doing well, and that Father should continue to have supervised visitation. However, toward the end of her testimony, the CASA testified that she favored the Department's future plans for B.A.M., which was to have his current foster family adopt him.

## Standard of Review

Father's first four issues in his brief assert legal and factual sufficiency challenges to the issue the jury answered deciding that Father's parental rights should be terminated. The dispute regarding terminating Father's parental rights was the primary issue in dispute during the trial, as Mother signed an affidavit

15

relinquishing her rights to B.A.M. before the trial began. When a jury is asked to resolve disputed fact issues, it acts in the proceeding as the factfinder, which requires that it decide the weight and credibility to give the testimony and the evidence introduced during the trial. *See City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex. 2005). As the factfinder, the jury may decide to believe one witness, disbelieve others, and it is authorized to resolve any inconsistencies that may exist in the evidence in the course of reaching its verdict. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex. 1986). Thus, if the jury could reasonably believe the testimony of one witness or disbelieve the testimony of others from the evidence admitted at trial, the appellate court "cannot impose [its] own opinions to the contrary." *City of Keller,* 168 S.W.3d at 819.

The standard that controls an appellate court's review of a legal sufficiency challenge in a parental-rights termination case requires that we review the evidence admitted during a trial "in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d 256, 266 (Tex. 2002). In contrast, when reviewing an appellant's factual sufficiency challenge in a parental-rights termination case, we are required to give "due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *Id.* In reviewing

16

an appellant's factual insufficiency issue in such cases, we must decide "whether [the] disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id*. For both factual and legal insufficiency issues, the appellate court in its review is required to review the evidence in a manner that is highly deferential to the jury's responsibility to weigh the evidence and determine which witnesses the jury decided were credible. *Id*.

## Failure to Comply with Court Order

Although Father's first four issues all assert legal and factual sufficiency challenges to the various grounds of termination the charge authorized the jury to use in deciding whether to terminate Father's rights, we address Father's fourth issue first, since resolving that issue in the Department's favor would allow the jury's conclusion terminating Father's parental rights to withstand the challenges he raises in issues one through three. *See* Tex. R. App. P. 47.1 (requiring appellate courts to issue a written opinion that is as brief as practicable, but that addresses all of the issues necessary to finally disposing of the particular appeal). In issue four, Father raises legal and factual sufficiency arguments regarding the jury's implied finding that he failed to comply with the terms of a court-ordered, family service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O) (allowing a court to involuntarily terminate the parent-child relationship if a parent fails to comply with the provisions

17

of a court order that specifically established the actions necessary for the parent to obtain the return of a child who has been in the Department of Family and Protective Services' custody for not less than nine months after the child's removal on grounds of abuse or neglect). In issue four, Father argues the Department failed to introduce both his family service plan and the court order requiring that he comply with the plan into evidence during the trial.

While we agree that the record shows that Father's family service plan and the court's order requiring his compliance with it were never admitted into evidence during the trial, the evidence before the jury includes evidence about the plan's requirements and the court's order, and when reviewed as a whole, this testimony allowed the jury to conclude that Father failed to comply with the requirements of a court-ordered, family service plan. For example, Caseworker One, Caseworker Two, and B.A.M.'s CASA addressed various requirements found in Father's family service plan, and this testimony allowed the jury to conclude that he knew about the requirements in his plan. While Father testified that the Department never provided him with a complete copy of his plan, Caseworker One and Caseworker Two both testified that they explained the requirements of Father's plan to him in their meeting with him. The record contains evidence that Father's family service plan required him to comply with urine testing as directed by the Department, but that Father failed

18

on more than one occasion while B.A.M. was in the Department's care to obtain the urine tests required under his family service plan. There was also testimony that Father failed to complete a course of substance abuse classes, and failed to complete a course of individual counseling. While several certificates were introduced into evidence purporting to show that Father, two days before the trial began, had completed substance abuse classes, individual counseling classes, and parenting classes, the certificates were not authenticated by anyone other than Father, as the counselor whose name is on the certificates did not testify. Additionally, the records were not proven to be authentic by a witness from the entity whose name appears on the certificates. Consequently, the jury could have reasonably concluded that Father not only failed to comply with the family service plan's requirements regarding regular urine tests, but also that he failed to complete the various counseling classes required by his plan.

The testimony in the trial showed that Father had a history of abusing several types of illegal substances. He tested positive for using methamphetamine after B.A.M. was in the Department's care. Father's history of substance abuse, coupled with a positive test for methamphetamine after the Department took B.A.M. into custody, and the evidence showing that Father missed a large number of monthly urine tests, allowed the jury to conclude that Father failed to comply with a material

part of his family service plan under the clear and convincing standard that applies to parental-rights termination trials. *See In re O.R.F.,* 417 S.W.3d 24, 38 (Tex. App.—Texarkana 2013, pet. denied) (explaining that drug addiction and its effect on a parent's life and ability to parent may support a course of conduct by a parent that justifies a decision to terminate a parent's rights); *see also In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that a parent's history of drug use is relevant to the trial court's best-interest finding); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ) (allowing a factfinder to give significant weight to a parent's drug-related conduct in making a best-interest finding). The jury could have concluded that Father failed to follow the recommendation of the therapist who saw him for substance abuse, as Caseworker One testified that Father's therapist discharged him from treatment before completing treatment when the "therapist determined that he could not work with [Father]." The jury was not required to believe that Father completed his treatment or that he followed all of the recommendations he received from his substance abuse counselor, or to believe that Father completed substance abuse counseling or the other classes he claimed to have completed. *See City of Keller,* 168 S.W.3d at 819.

In conclusion, the testimony before the jury clearly and convincingly established that Father materially breached several of the requirements in his family service plan. We conclude the evidence before the jury addressing Father's noncompliance with his family service plan was both legally and factually sufficient to support the jury's conclusion that Father failed to comply with the requirements of his court-ordered, family service plan. *See In re J.F.C.,* 96 S.W.3d at 266. Issue four is overruled.

## Best Interest

In issue five, Father argues that the evidence admitted during the trial was legally and factually insufficient to support the jury's finding that terminating his parental rights was in B.A.M.'s best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2) (West Supp. 2017). With respect to a child's best interest, there is a "strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006); *see* Tex. Fam. Code Ann. § 153.131 (West 2014). Additionally, courts also presume that a prompt and permanent placement of a child in a safe environment is in the child's best interest. Tex. Fam. Code Ann. § 263.307(a) (West Supp. 2017). In reviewing a jury's best-

interest finding, we consider the nine non-exhaustive factors identified in *Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex. 1976).[4]

B.A.M was almost six when the trial occurred. During the trial, the jury heard evidence that Father had historically abused a number of illegal substances (cocaine, marijuana, PCP, and methamphetamine); that he tested positive once for using methamphetamine on a urine test he took after the Department took B.A.M. into custody; that he failed to submit to regular bi-weekly urine testing, as directed by the Department; and that he failed to complete substance abuse counseling with the therapist the Department referred him to see.

---

[4] In *Holley,* the Texas Supreme Court indicated that courts should apply the following factors to determine, when deciding whether to terminate a parent's relationship with a child, that termination is in the child's best interest:

- the child's desires;
- the child's emotional and physical needs, now and in the future;
- the emotional and physical danger to the child, now and in the future;
- the parenting abilities of the parties seeking custody;
- the programs available to assist the parties seeking custody;
- the plans for the child by the parties seeking custody;
- the stability of the home or the proposed placement;
- the parent's acts or omissions which may indicate that the existing parent-child relationship is improper;
- any excuse for the parent's acts or omissions.

*Holley v. Adams,* 544 S.W.2d 367, 371-72 (Tex. 1976).

Father offered several excuses during the trial for his failure to comply with the requirements found in his family service plan. For instance, Father claimed he was employed "off the table" to explain why he could not document his alleged earnings, but the jury could have reasonably believed that Father was not working "off the table" and that Father had not worked in the eight month period before the trial. Father also claimed he did not understand the requirements of his plan, but his actions allowed the jury to conclude that he understood several parts of the plan and that he did not comply with the parts of the plan that he clearly understood. The jury could also have reasonably rejected Father's testimony that he recently completed substance abuse counseling, parenting classes, and individual counseling, since Peggy Heath, the counselor whose name appears on the certificates that Father presented, did not testify in the trial and the certificates were not authenticated by The Mental Health Resource Center, the entity whose name is on the certificates.

Father's history of drug use, failure to complete the various classes required by his family service plan, and his spotty employment history allowed the jury to infer that Father's proposed placement in his mother's home would not provide B.A.M. with a stable environment with a parent who would be able to adequately provide B.A.M. a safe, stable, and drug-free environment sufficient to meet B.A.M.'s physical and emotional needs.

The evidence before the jury also addressed B.A.M.'s physical and emotional needs. The testimony before the jury reflects that B.A.M. was in a foster home, the home gave B.A.M. a very structured, loving, and organized environment, along with five other children. Caseworker Two testified that B.A.M. was doing "[v]ery well" in that placement.

The testimony before the jury addressed the various options being proposed regarding B.A.M.'s future. Father testified that B.A.M. should be returned to him so that he could live with Father and his paternal grandmother in the home he was in before the Department removed B.A.M. from his grandmother's home. B.A.M.'s CASA expressed concern about Father's plan, indicating that B.A.M.'s grandmother had visited him only one time since he was removed from her home ten months earlier. The CASA also felt that B.A.M. was receiving the structure and discipline he needed in his current placement, and she commented that structure was lacking when she saw B.A.M. in his paternal grandmother's home. Additionally, there was testimony admitted in the trial from an assistant caseworker who worked for the Department that B.A.M.'s paternal grandmother failed to follow through with the Department's directions regarding B.A.M.'s therapy and medical care while B.A.M. was living with his grandmother. The assistant caseworker also testified that B.A.M.'s grandmother failed to enroll B.A.M. in school. At one point in the trial,

24

B.A.M.'s CASA testified that she thought B.A.M. should remain in foster care with Father retaining his right to exercise supervised visitation, but she later indicated that she agreed with the Department's recommendation that B.A.M. should be adopted by his foster parents. Additionally, the CASA pointed to Father's lack of stable employment, failure to comply with and complete his family service plan, and to his lack of housing separate from his mother as instabilities in Father's lifestyle that she thought should be resolved before she would recommend that B.A.M. be returned to his father's custody.

The testimony in the trial indicates that the Department's plan was to have B.A.M. adopted by the foster family where he currently lives. Caseworker One testified that Father had not demonstrated that he could provide a safe, stable, nonviolent, and drug-free environment for B.A.M. While Caseworker One acknowledged that Father completed a few of the requirements in his family service plan, she was critical that he failed to follow through on many of the requirements that are in his plan. Caseworker One also expressed serious concerns about Father's anger and outbursts that occurred following B.A.M.'s emergency removal. According to Caseworker One, she had to get a safety specialist involved in B.A.M.'s case in response to outbursts and threats that Father directed at the

Department's staff. Caseworker One testified that Father never completed the therapy that the Department felt he needed to address his anger management issues.

Viewing the evidence before the jury as a whole, the evidence authorized the jury to infer that terminating Father's parental rights would serve B.A.M.'s best interest. *See In re J.D.,* 436 S.W.3d 105, 119 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("A parent's inability to provide adequate care for her children, unstable lifestyle, lack of a home and income, lack of parenting skills, and poor judgment may be considered when looking at the children's best interest."); *In re M.R.,* 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) (explaining that a parent's history of drug use is relevant to the trial court's best-interest finding); *Dupree,* 907 S.W.2d at 86 (allowing a factfinder to give significant weight to a parent's drug-related conduct in making a best-interest finding). The jury simply was not required to accept Father's testimony that he is equipped with the parenting skills and employment that will be needed to give B.A.M. a safe, stable, and drug-free environment. *See City of Keller,* 168 S.W.3d at 819.

After considering the non-exhaustive *Holley* factors, and reviewing the evidence in the light that favors the jury's verdict, we conclude that legally and factually sufficient evidence supports the jury's best-interest finding. We overrule issue five.

Objection to Caseworker One's Testimony

In issue six, Father argues the trial court erred when it overruled his request to strike Caseworker One's testimony because she talked to an expert and reviewed documents that the Department did not disclose to Father during discovery. According to Father, once he discovered during the trial that Caseworker One was testifying about Father's behavior based in part on information that the Department had not disclosed, the trial court should have granted his request to strike Caseworker One's testimony from the record.

We review a trial court's evidentiary rulings using an abuse of discretion standard. *In re J.P.B.,* 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion when it acts without regard to the guiding rules or principles governing the admission of evidence, or if its decision to admit evidence is shown to have been arbitrary or unreasonable. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985).

In this case, the objection Father raised at trial to Caseworker One's testimony asked that all of her testimony be stricken, and he did not limit his request to that testimony relevant to the Department's alleged failure to comply with the obligations the Department owed Father to comply with his requests for discovery. Generally, if some portion of the evidence to which an objection is made is admissible, a trial

court may overrule an objection that is directed at the evidence as a whole when the party opposing its admission fails to specify those portions of the evidence that are inadmissible. *See* Tex. R. App. P. 33.1(a)(1)(A) (Error Preservation) (explaining to preserve error an objection must be sufficiently specific to inform the trial court of the complaint); *Bennett v. Hood,* 238 S.W.2d 587, 590 (Tex. Civ. App.—Beaumont 1951, no writ) ("A motion to strike all the testimony of a witness when some of it is admissible and some is not will not be sustained where the motion does not point out the inadmissible testimony."); *see also Speier v. Webster College,* 616 S.W.2d 617, 619 (Tex. 1981) (quoting *Brown & Root, Inc. v. Haddad,* 142 Tex. 624, 180 S.W.2d 339, 341 (1944)). Even if we assume that Father was entitled to have some portion of Caseworker One's testimony excluded due to the Department failure to fully and properly respond to Father's discovery, the trial court was not required to grant the request that Father's attorney made to strike all of Caseworker One's testimony. *Id.* Portions of Caseworker One's testimony that did not depend on the information the Department failed to disclose were clearly admissible. For example, Caseworker One's testimony that she explained the requirements of the family service plan to Father is testimony that was both relevant and admissible during the trial. *See* Tex. R. Evid. 401, 402. Because the trial court properly overruled Father's request to strike Caseworker One's testimony in its entirety, the trial court did not

28

abuse its discretion when it overruled Father's request. Therefore, we overrule issue six.

In issue seven, Father argues the trial court erred when it overruled his objection to the Department's suggestion in closing argument that Father could have refused to allow Mother to exercise her visitation rights and to have refused to allow Mother to see B.A.M. given Mother's rights as B.A.M.'s possessory conservator. According to Father, the argument the Department presented in summation was improper because the argument misstated the law and amounted to nothing more than an attempt to "score points" given the lack of evidence showing that Father engaged in conduct that endangered B.A.M.'s safety.

Father's argument in issue seven is linked to his argument that there was insufficient evidence before the jury to establish that Father engaged in acts that endangered B.A.M.'s physical or emotional well-being or to establish that he placed B.A.M. with Mother knowing that she presented a danger to B.A.M.'s physical or emotional well-being. As we previously explained, we were not required to reach these arguments, which relate to Father's first two issues, because we have upheld the jury's verdict on grounds other than those Father has challenged in issues one and two. Therefore, since issue seven is linked to issues one and two, issues we did

29

not reach, we also need not reach his argument in issue seven to resolve Father's appeal. Tex. R. App. P. 47.1. And, even had we decided to address the argument Father presents in his seventh issue, he presented no argument in his brief to explain how the Department's allegedly improper argument regarding Father's right to disregard Mother's rights established by a court order resulted in any harm that related to the jury's determination that Father failed to comply with the requirements of his court-ordered, family service plan. Father's issue seven arguments appear wholly unrelated to issue four, the issue on which we have sustained the jury's verdict.

To obtain a reversal on a complaint that concerns an error that occurred during final argument, the appellant must demonstrate not only error but that the trial court's ruling on the matter was harmful. *See* Tex. R. App. P. 44.1(a); *see In the Interest of M.G.*, No. 05-01-01961-CV, 2002 Tex. App. LEXIS 8187, at **23-24 (Tex. App.—Dallas, Nov. 20, 2002, pet. denied) (not designated for publication) (explaining that a party must establish that an error occurred in a ruling the trial court made in final argument and that the trial court's ruling was reasonably calculated to and probably caused the jury to reach an improper verdict). Because the arguments Father advances in support of his seventh issue do not explain how he was harmed in a manner that related to the jury's finding that he failed to comply with the

requirements of his family service plan, issue seven is overruled. Tex. R. App. P. 44.1(a).

## Conclusion

Based on our rulings on issues four through seven, we affirm the trial court's judgment. Tex. R. App. P. 47.1.

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on February 14, 2018
Opinion Delivered April 5, 2018

Before Kreger, Horton and Johnson, JJ.